IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

Civil No. 3:22-CV-00093-PDW-ARS

| | | |
|---|---|---|
| Jessica Allen, individually and on behalf of the Heirs at Law of Lacey Higdem, | ) ) ) ) | |
| Plaintiff, | ) ) ) | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MYLES BRUNELLE, APRIL AZURE, AND ROLETTE COUNTY'S MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | |
| Myles Brunelle, in his individual capacity; April Azure, in her individual capacity; Rolette County; Roy Cordy, MD; and Presentation Medical Center, | ) ) ) ) ) ) | |
| Defendants. | | |

\*\*\*            \*\*\*            \*\*\*

## I.    INTRODUCTION

County Defendants[1] are entitled to summary judgment because there are no facts to support a finding that Defendants Myles Brunelle or April Azure were deliberately indifferent to any obvious medical need of Lacey Higdem or that any County employee violated her constitutional rights during her detainment at the Rolette County Law Enforcement Center on June 3-4, 2020. The undisputed facts show none of the jail staff who were present during Higdem's roughly 9 hours at the jail prior to her death were informed that Higdem had tested positive for several drugs, including methamphetamine, when she was medically cleared for jail by Dr. Roy Cordy at Presentation Medical Center only minutes before she was booked into jail. The dearth of evidence to show any of Higdem's constitutional rights were violated by County Defendants is also fatal to Allen's derivative *Monell*

---

[1] Defendants Myles Brunelle ("CO Brunelle"), in his individual capacity, April Azure ("CO Azure"), in her individual capacity, and Rolette County ("County") are collectively referred to herein as "County Defendants."

claim, and there is similarly no evidence showing any custom, pattern, or practice of County contributed to Higdem's death. Even assuming, arguendo, that there are facts to support a plausible violation of Higdem's constitutional rights, CO Brunelle and CO Azure are entitled to qualified immunity as any such constitutional right was not clearly established by existing precedent involving similar circumstances at the time of the events at issue. Finally, Plaintiff's claim for punitive damages against CO Brunelle and CO Azure should be dismissed as there are no facts to support a finding of evil motive or intent, or reckless or callous indifference to Hidgem's constitutional rights.

## II.    PROCEDURAL HISTORY

This case stems from the June 4, 2020, death of Lacey Higdem ("Higdem") which occurred at the Rolette County Law Enforcement Center ("Jail") shortly after she was evaluated and medically cleared for jail by Defendant Roy Cordy, MD ("Dr. Cordy") at Presentation Medical Center ("PMC") in Rolla, North Dakota.  Plaintiff Jessica Allen ("Allen"), Higdem's mother, commenced this civil action through the filing of the original *Complaint* (Doc. 1) on May 31, 2022, and brought claims individually and on behalf Higdem's heirs at law against County Defendants, Dr. Cordy, and PMC. Allen's current claims are set out in her *Amended Complaint* (Doc. 10) filed July 11, 2022.

With respect to County Defendants, Allen alleges CO Brunelle and CO Azure, in their individual capacities, were deliberately indifferent to the serious medical needs of Higdem, in violation of Higdem's rights under the Eighth and Fourteenth Amendments to the United States Constitution. *Am. Compl.* (Doc. 10) at ¶¶ 124-135. As part of that claim, Allen alleges CO Brunelle and CO Azure violated Higdem's constitutional rights "either maliciously or by acting with reckless disregard for whether Lacey's rights would be violated by their actions" and that CO Brunelle and CO Azure's "misconduct played a direct and substantial role in causing Lacey's untimely and preventable death." *Am. Compl.* (Doc. 10) at ¶¶ 128-129.

Allen's other claim against County Defendants is a *Monell* claim against County. *Am. Compl.* (Doc. 10) at ¶¶ 136-140. As part of that claim, Allen alleges that "Before June 3, 2020, Rolette County, with deliberate indifference to the rights of inmates at the Jail, initiated, permitted, tolerated, failed to correct, promoted, and ratified customs, patterns and practices on the part of its correctional officers, including Defendants Brunelle and Azure, of failing to provide for the safety and general well-being of inmates and failing to protect inmates with serious medical needs." *Am. Compl.* (Doc. 10) at ¶ 137. Allen alleges Rolette County's "unconstitutional customs, patterns and practices were the moving force behind the violation of [Higdem's] constitutional rights and played a direct and substantial role in causing her untimely and preventable death." *Am. Compl.* (Doc. 10) at ¶ 138.

Allen's final *Amended Complaint* claim is for medical malpractice/wrongful death claim against Dr. Cordy and PMC, in which Allen alleges:

> 144.   The acts and omissions constituting negligent care and treatment by [Dr. Cordy and PMC] include, but are not limited to, the following: failing to meet accepted standards of practice for emergency medicine at the time of this encounter; failing to reasonably communicate about [Higdem's] condition; failing to reasonably and timely identify signs and symptoms of dangerous conditions; failing to take reasonable time to further evaluate and treat [Higdem] given her presentation at PMC; failing to reasonably complete the medical clearance for incarceration process to ensure that [Higdem] was a proper candidate for admission to the Jail; opting to discharge a patient in need of further care; and [Dr. Cordy and PMC] individually and collectively, were in other ways negligent in their care and treatment of [Higdem].

*Am. Compl.* (Doc. 10) at ¶ 144. In this brief, County Defendants take no position as to the merits of Allen's medical malpractice/wrongful death claim against Dr. Cordy and PMC.

Since the case was initiated, there has been a considerable amount of written discovery exchanged and over 20 depositions of fact and expert witnesses have been conducted. A jury trial for this case is scheduled to begin on June 10, 2025. Doc. 40.

## III.    FACTUAL BACKGROUND

### A.    <u>Higdem's Mental Health and Substance Abuse Issues</u>

At the time of her tragic death at 19 years old, Higdem had been struggling with mental health and substance abuse issues for years which escalated until the time of her death. In February 2017, when she was 15 years old, Higdem was admitted to Prairie St. John's psychiatric hospital for seven days because she was drinking, smoking pot, cutting herself, and saying she was going to commit suicide. Videotaped Deposition of Jessica Allen, May 14, 2024 ("Allen Dep.") (**Ex. A**)[2] at p. 13. During that stay, she was diagnosed with adjustment disorder with depressed mood, mild alcohol use disorder, severe cannabis use disorder, nicotine use disorder, and elevated ALT. (**Ex. B** at p. 1). Allen testified that Higdem suffered from anxiety and depression beginning at age 9 or 10 which continued until her death. Allen Dep. at p. 74.

Allen testified that Higdem was placed in drug court (on April 4, 2019, while Higdem was pregnant with L.H.) after being caught with marijuana, and that while she was on probation she repeatedly tested positive for marijuana and other drugs including Adderall. Allen Dep. at p. 194; (**Ex. C** at pp. 5-7). Allen had thought Higdem successfully completed the drug court program, but in fact Higdem was removed from drug court and placed on home monitoring due to repeated positive marijuana tests in July 2019. Allen Dep. at p. 199; (Ex. C at pp. 2-3).

Higdem also struggled with alcohol, and her legal problems with alcohol escalated during her pregnancy and shortly after she gave birth to L.H. (Ex. C at p. 4). On November 6, 2019, Higdem was charged with minor in consumption when she was approximately 8 months pregnant. (Ex. C at p. 1). She was charged with minor in consumption in a separate incident on December 26, 2019, slightly over one week after giving birth to L.H. Allen Dep. at p. 206. On May 1, 2020, roughly one month before her death, Higdem was again charged with minor in consumption or

---

[2] A true and correct copy of each exhibit referenced herein is attached to the Affidavit of Grant T. Bakke, December 16, 2024, filed herewith.

possession. (**Ex. D** at p. 1). Allen testified that she began buying alcohol for Higdem when she turned 18. Allen Dep. at p. 120.

At the time of her death, Higdem resided in Casselton with Allen. Allen Dep. at pp. 101-102. Allen testified that Higdem's reason for being in Rolette County at the time of her death in June 2020 was to visit her boyfriend who lived there. Allen Dep. at p. 102. Allen testified that Higdem's boyfriend was a drug dealer and drug addict. Allen Dep. at pp. 101, 103. She testified that that a couple days before Higdem's death, Allen learned that Higdem had been staying at a drug house in Rolette County during her trip. Allen Dep. at pp. 105, 109. Allen further testified that on June 2, she had a FaceTime call with Higdem during which she could tell Higdem was hallucinating on methamphetamine due to funny movements Higdem was making with her mouth. Allen Dep. at pp. 162-163. At that time, Allen told Higdem she was going to drive to Rolette County to pick her up and bring her home to Casselton. Allen Dep. at pp. 109-115. However, Allen never ended up going to pick Higdem up. Allen Dep. at p. 164.

### B.  Higdem's Arrest

At 12:20 pm on June 3, 2020, Bureau of Indian Affairs ("BIA") Tribal Police Officer Animikig Laverdure ("Officer Laverdure") received a phone call at the Belcourt police station during which the caller informed him that there was a female in the trees near the caller's residence on reservation land near BIA road 5 in Rolette County who was screaming and yelling for help. (**Ex. E** at p. 2). Officer Laverdure responded to the call and traveled to the area described by the caller. (Ex. E at p. 2). In his General Report, Officer Laverdure described the events upon his arrival at the scene, in relevant part, as follows:

> I was able to hear a female screaming for help in the trees. I advised dispatch I will be going out on foot to search the trees for the female.
>
> The tree line was approximately 25 years from the gravel road. I began walking into

the tree line. Even though I could not see anyone in the trees I could hear a female screaming "help me?" When I did see her she was approximately 25 yards away from my location. I announced to her that I am Law Enforcement. She began running toward my direction and yelling "kill me" and "please shoot me." I noticed she was wearing basketball shorts and a white Tank top. I did not recognize her and I don't recall ever seeing her before.

She ran up to my location and was about an arm distance away from me. As she repeatedly saying shoot me and kill me I extended my arms out toward her and said no. She used both hands and grabbed both of my wrist. I asked her to stop and that I am not going to do what she asked me to do. I noticed she was talking fast. She was talking all over the place. She appeared to be super hyper. Her hair was messy and full of sticks. Her clothes and skin were dirty. On of her legs were scratched up. I assumed her appearance was from running through the trees. Based upon my training and experience I could tell she was under the influence of an illegal substance, which is illegal on the Turtle Mountain Indian Reservation.

After I told her no, she began running toward the gravel road which the speed limit is approximately 45 miles per hour in this area. I could see another vehicle, a garbage truck driving northbound and two other vehicles behind the garbage truck. She was creating a dangerous circumstance to herself and other people. As she began running toward the road I immediately instructed her to stop. When she refused to listen to my verbal commands I detained her by grabbing her arm and escorting her to the grass. I knelt down beside her holding both of her arms behind her back while she laid on her stomach. I requested dispatch to send me an ambulance and a second officer. Austin Jeanotte, a Tribal Officer with Belcourt responded.

I held her for approximately 30 seconds until Officer Jeanotte arrived. While I held her down awaiting for Officer Jeanotte to arrive I continued to hold her arms behind her back. She was scratching at my latex gloves. She repeatedly told me to kill her and shoot her.

Tribal Police Officer Austin Jeanotte then arrived on scene and I advised him to put handcuffs on her while I held her arms. Officer Jeanotte handcuffed Lacey. After she was handcuffed I placed my left hand on her back between her shoulder blades. In a calm voice I asked her name? She told me her name is Lacey. I asked her what is she doing? Lacey told me that there were black guys chasing her in the trees but you need to go save them. Officer Jeanotte brought his marked police unit closer to our position. He then assisted me in picking her up off the ground.

I placed her into the back seat of Officer Jeanotte's police unit and closed the door. Lacey immediately began kicking the window and door. Officer Jeanotte's window is not protected with bars. He then drove my vehicle closer to our position. My patrol unit has bars to protect the windows. She was placed into the back seat of my patrol unit. While Lacey was in the back seat of my patrol unit, she banged her head on the cage a few times. I notified dispatch that she was banging her head on my cage. I then

asked her to keep calm and an ambulance is on their way. Lacey stopped.

\*                                        \*                                        \*

Lacy told me she had her baby with her. I asked where is the baby and Lacey said in the trees. I asked Officer Jeanotte to start looking in the trees for a baby. Officer Jeanotte began looking in the trees. Lacey then told me she had a 100 babies and that we need to save them all. She asked us to save the trees along with all different races of people in the trees. She also told me that she doesn't want to kill anyone. I asked Officer Jeanotte to come back.

(Ex. E at pp. 2-3) (errors in original). Officer Laverdure determined Higdem was not an enrolled

member of the Turtle Mountain Band of Chippewa Indians and requested a deputy from the Rolette

County Sheriff's Office to come to the scene and take custody of Higdem. (Ex. E at p. 3). At 12:54

pm, Chief Deputy Mitchell Slater of the Rolette County Sheriff's Office ("Chief Deputy Slater")

responded to Officer Laverdure's request for assistance. (**Exs.** E at p. 3; **F** at p. 1; **G** at p. 1).

Officer Laverdure further provided in his General Report:

Officer Jeanotte left the scene. An ambulance from Rolla arrived about the same time as Deputy Slater. Lacey told Deputy Slater to remove a pipe from her bra. The EMS worker, a female, offered to remove the pipe. The EMS worker searched her bra and found small clear plastic baggies that were empty. She handed them to Deputy Slater. Deputy Slater asked Lacy if she needs any medical attention? Lacey responded no she did not. Deputy Slater asked again and then she answered yes she would like to go to the hospital.

I removed Officer Jeanotte's handcuffs and I released Lacey to Deputy Slater who placed his handcuffs behind her back where Deputy Slater placed Lacey into the backseat of his patrol unit. Deputy Slater and the ambulance left the scene. I went back into service.

(Ex. E at p. 3) (errors in original).

In his incident report, Chief Deputy Slater described his encounter with Higdem as follows,

in relevant part:

Upon arrival to BIA road 5 near the Jody Smith residence I came across BIA officer Laverdure. Prior to arrival I heard some traffic of Officer Laverdure stating that a female subject was hitting their head off his vehicle cage. When I spoke to officer Laverdure he stated that he was called to a report of a woman screaming in the

trees. Officer Laverdure stated he located the subject in the ditch and when he went down to talk to her she attempted to attack him. Officer Laverdure stated that he was able to arrest the female who was then identified as Lacey Higdem. Officer Laverdure stated that Higdem was stating that people were trying to kill her and that officers were trying to kill her. Officer Laverdure stated that an ambulance was in route to the area.

I went spoke [*sic*] to Higdem who was in the back seat of Laverdure's patrol car. Higdem stepped out and began to stare into the trees. Higdem told me that I need to "Save them". I asked Higdem who. Higdem stated that "please don't kill them, please don't kill them". I advised Higdem that we weren't going to kill anyone. Higdem had lots of movement to her body and could not stand still.

Rolla ambulance arrived on scene. During their assessment Higdem was searched by a female EMT at the request of law enforcement. When asked if she would have anything on her Higdem stated that she had a glass pipe in her bra. During that search no bra was found. Higdem did however possess several small baggies that based off my experience in law enforcement were similar to ones used to package narcotics.

(Ex. F at pp. 1-2). Higdem was placed under arrest on charges of disorderly conduct and preventing arrest. (**Ex. H**). At his deposition, Chief Deputy Slater testified that when he first encountered Higdem, she smelled of urine and appeared to be under either under the influence of drugs or experiencing a mental health issue. Transcript of Audiovisual Deposition of Mitchell Slater, January 29, 2024 ("Slater Dep.") (**Ex. I**) at p. 85. Chief Deputy Slater testified that he did not recall whether anyone advised him at the scene of Higdem's arrest that she was under the influence of methamphetamine. Slater Dep. at p. 91.

At 12:50 pm, Community Ambulance Service paramedics Darren Welander and Carol Carlson arrived on the scene in an ambulance. (**Ex. J**). In their Prehospital Care Report, Darren Welander and/or Carol Carlson provided the following narrative:





(Ex. J at p. 1) (errors in original).[4] Chief Deputy Slater then transported Higdem to Presentation Medical Center ("PMC") in his patrol vehicle, where they arrived at 1:25 pm. (Exs. F; G).

### C.  Medical Clearance of Higdem by Dr. Cordy at Presentation Medical Center

Chief Deputy Slater testified that the purpose of transporting Higdem to PMC prior to transporting her to jail was to obtain medical clearance that she was fit for jail and to ensure she did not need further medical attention or treatment before being booked into jail. Slater Dep. at p. 86. He



testified that when he and Higdem arrived at PMC, they were placed in an examination room, where he spoke with Dr. Cordy. Slater Dep. at p. 99-100. Chief Deputy Slater testified that he believes Dr. Cordy asked him if he "needed a medical clearance," to which Chief Deputy Slater responded that was what they were there for unless Dr. Cordy needed to treat Higdem for anything else. Slater Dep. at p. 100.

Registered nurse Melissa Obal ("nurse Obal") performed an initial assessment of Higdem when she and Chief Deputy Slater arrived at PMC. Oral and Videotaped Deposition of Melissa Obal, May 29, 2024 ("Obal Dep.") (**Ex. K**) at pp. 112-113. Nurse Obal charted ████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ (**Ex. L** at p. 1). Nurse Obal testified that Higdem's elevated heart rate was consistent with methamphetamine intoxication and was concerning to her. Obal Dep. at p. 128. She further testified that she would want to see Higdem's heart rate decrease before she was discharged from PMC. Obal Dep. at p. 128.

Nurse Obal testified that Higdem was crying when she first saw her, and that she did not remember if Higdem was hallucinating at that time. Obal Dep. at pp. 112-113. She testified that she did not believe Higdem was confused because she was able to answer intake questions. Obal Dep. at p. 113. Nurse Obal testified that Higdem admitted to her that she had taken methamphetamine, and that Higdem was compliant when she instructed her to urinate in a cup for a drug analysis. Obal Dep. at p. 113.



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dr. Cordy testified that when he evaluated Higdem on June 3, 2020, he was aware that she was at PMC for a medical clearance prior to being booked into jail. Transcript of Audiovisual Deposition of Roy Cordy, MD, April 29, 2024 ("Dr. Cordy Dep.") (**Ex. M**) at p. 10. He testified that part of a medical clearance requires the doctor to rule out conditions that might be acutely life threatening. Dr. Cordy Dep. at p. 120. He testified that correctional officers rely on his medical clearance of inmates. Dr. Cordy Dep. at p. 203. Dr. Cordy testified that he first examined Higdem after nurse Obal had taken Higdem's intake vital signs. Dr. Cordy Dep. at p. 15. He testified that Higdem's demeanor stood out from most jail medical clearances he performed for other individuals because she "was a little bit more than most patients that we'd see for medical clearance in how she was acting, her behavior. . . . she was hallucinating. She was delusional. She . . . had difficulties intermittently focusing on, you know, the interaction between her and myself." Dr. Cordy Dep. at pp. 12-13. In his initial assessment note, Dr. Cordy charted at 1:56:



(Ex. L at p. 3) (errors in original). Dr. Cordy testified that Higdem herself told him that she had taken methamphetamine. Dr. Cordy Dep. at p. 52. He testified that Higdem did not tell him she had a history

of chronic methamphetamine use, but he had assumed that was the case because she had been to treatment twice. Dr. Cordy Dep. at p. 62.

Dr. Cordy testified that he attributed Higdem's hallucinations, high blood pressure, and high pulse rate to methamphetamine use. Dr. Cordy Dep. at p. 69. He testified that he believed Higdem was delusional because she was thinking one thing was happening but in fact the opposite thing was happening and because she was seeing things that weren't there. Dr. Cordy Dep. at p. 96. He testified that he did not believe Higdem was severely intoxicated on methamphetamine when he evaluated her. Dr. Cordy Dep. at p. 95. Dr. Cordy testified that Higdem was exhibiting signs and symptoms of agitated delirium when he examined her and agreed with PMC literature which provides "All patients exhibiting agitated delirium from amphetamines . . . should be observed until no longer symptomatic." Dr. Cordy Dep. at p. 115.

The only time Higdem's vital signs were charted after her initial assessment by nurse Obal were just prior to discharge. Obal Dep. at p. 129. At 3:00 pm, nurse Obal charted that Higdem's temperature was 99 degrees, but she did not chart any measurements for Higdem's pulse, respiratory rate, blood pressure, or oxygen saturation as she had done for Higdem's intake vital signs. (Ex. L at p. 1). Nurse Obal testified that she does not know why Higdem's discharge vital sign measurements were not charted (other than her temperature), and she testified that she did not remember if she in fact measured those vital signs prior to Higdem's discharge from PMC. Obal Dep. at p. 131. She denied remembering whether she later told Dr. Cordy that she had forgotten to take Higdem's discharge vital signs. Obal Dep. at pp. 133-134. As to Higdem's discharge instructions, nurse Obal charted at 3:26 pm that " ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (Ex. L at p. 4) (errors in original).

However, the discharge instructions nurse Obal provided were only signed by nurse Obal, not by Higdem. (**Ex. N**).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ (Ex. N at p. 5). Dr. Cordy admitted the written discharge instructions provided for Higdem did not meet the standard of care due to the failure to include any instructions in relation to her methamphetamine intoxication. Dr. Cordy Dep. at pp. 127-128. There is no indication in the discharge instructions that Higdem had tested positive for methamphetamine, amphetamine, and cannabinoids during her evaluation at PMC. (*See* Ex. N at p. 4). Nurse Obal denied remembering whether she gave Higdem or Chief Deputy Slater any oral discharge instructions about monitoring for symptoms or signs of deterioration in Higdem's condition as it relates to meth intoxication. Obal Dep. at pp. 138-139. Nurse Obal testified that she was aware of Higdem's positive test for those drugs before Higdem was discharged from PMC that afternoon. Obal Dep. at p. 142.

Higdem was discharged from PMC at 3:15 pm. (**Ex. O** at p. 1). Dr. Cordy testified that the decision to discharge Higdem was his alone. Dr. Cordy Dep. at p. 56. He testified that Higdem was at PMC for a total of one hour and 40 minutes, but that he was not with her that entire time, and he examined her two or three times. Dr. Cordy Dep. at pp. 99, 101, 158. Dr. Cordy testified that to his recollection, neither Higdem nor Chief Deputy Slater were instructed to return to PMC if Higdem's hallucinations, delusional behavior, or intoxication level seemed to worsen. Dr. Cordy Dep. at p. 109. He testified that there should have been written discharge instructions provided which indicated that jail staff should be on the lookout for deterioration of Higdem's mental status, worsening of cognition, difficulty breathing, and dizziness. Dr. Cordy Dep. at p. 110. Dr. Cordy testified that of the many

patients he treated at PMC who presented with meth intoxication, he did not have a single adverse outcome when the patient was kept at the hospital. Dr. Cordy Dep. at pp. 111-112.

Dr. Cordy testified that even though Higdem's discharge vital signs were not charted that he did in fact measure some of them prior to her discharge and they were all in the normal range. Dr. Cordy Dep. at p. 48. He testified that it was important to chart whether Higdem's elevated heart rate, as measured at her admission, had returned to normal upon her discharge, but that information was not charted. Dr. Cordy Dep. at p. 48. Dr. Cordy testified that Higdem's blood pressure was not measured upon her discharge. Dr. Cordy Dep. at p. 54. When asked whether that was a mistake, Dr. Cordy testified, "The nurse did not take it and I wasn't aware until after the patient left that it wasn't taken." Dr. Cordy Dep. at p. 54. He testified that after Higdem was discharged, he told nurse Obal that she should have taken Higdem's full set of vital signs before she was discharged. Dr. Cordy Dep. at p. 131. Dr. Cordy testified that part of the reason he did not think Higdem should have been admitted to PMC rather than discharged to the Jail is that PMC does not take care of patients in Higdem's situation, does not have staff available to watch her or take care of her, and does not have adequate security for individuals who are in law enforcement custody. Dr. Cordy Dep. at p. 184.

Dr. Cordy testified that at the time he discharged Higdem, she was no longer symptomatic of agitated delirium because she was calm, no longer hallucinating, well aware of her situation, and crying because she did not want to go to jail. Dr. Cordy Dep. at p. 116. He testified the charting from his evaluation of Higdem does not make any mention that Higdem's orientation had improved from the time of intake to her discharge from PMC or that her hallucinations had ceased. Dr. Cordy Dep. at pp. 167, 210. Dr. Cordy testified that it is his belief that Higdem was experiencing subacute methamphetamine intoxication when he discharged her. Dr. Cordy Dep. at p. 118. He is not aware whether Higdem was found to be hallucinating immediately upon her arrival at the jail after she was

- 14 -

discharged from PMC. Dr. Cordy Dep. at p. 117.

Dr. Cordy testified that he diagnosed Higdem with a mild-to-moderate urinary tract infection and moderate methamphetamine toxication, but that the methamphetamine toxication diagnosis was not charted. Dr. Cordy Dep. at pp. 53, 76. He testified that the failure to chart Higdem's methamphetamine toxication diagnosis was a significant error that did not meet the standard of care. Dr. Cordy Dep. at pp. 53, 123. He further testified that Higdem's methamphetamine toxication was more dangerous to her than her urinary tract infection, and that her urinary tract infection did not present a serious medical risk. Dr. Cordy Dep. at pp. 56, 187-188. Dr. Cordy testified that patients under the influence of methamphetamine can present with a range of symptoms, from being virtually asymptomatic to being in danger of imminent cardiovascular collapse. Dr. Cordy Dep. at p. 92. He agreed that life-threatening methamphetamine intoxication is characterized by hypertension, tachycardia, severely agitated delirium, hyperthermia, metabolic acidosis and seizures, but he stated that a patient in experiencing life-threatening methamphetamine intoxication would not necessarily present all of those symptoms. Dr. Cordy Dep. at p. 93.

Dr. Cordy testified that he ordered lab work for Higdem to evaluate possible causes of her behavior and hallucinations and that he reviewed the results of Higdem's lab work prior to discharging her from PMC. Dr. Cordy Dep. at pp. 68, 70. He testified that he was aware that Higdem had tested positive for methamphetamine, amphetamine, and cannabinoids prior to discharging her, but that the lab results did not indicate the amount of methamphetamine or amphetamine present in Higdem's system at the time. Dr. Cordy Dep. at p. 82. Dr. Cordy also testified that the results of Higdem's lab work indicated she was probably "a little bit short on fluids." Dr. Cordy Dep. at p. 83. ████████

████████████████████████████████████████████████████████

████████████████████████████ (Ex. O at p. 2); Dr. Cordy Dep. at p. 103. ████████



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. O at p. 3); Dr. Cordy Dep. at p. 105. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. Dr. Cordy Dep. at p. 106.

Dr. Cordy testified that after he learned Higdem had died, he went back into her chart from his medical clearance of Higdem and added that she had tested negative for COVID-19. Dr. Cordy Dep. at p. 55. He denied making any other changes to Higdem's chart after she was discharged. Dr. Cordy Dep. at p. 55. It is Dr. Cordy's belief that Higdem somehow obtained and ingested more methamphetamine or some other substance after she was discharged from PMC. Dr. Cordy Dep. at pp. 186-187. He believes her ingestion of the later-acquired substance ultimately caused Higdem's death. Dr. Cordy Dep. at pp. 186-187.

In his incident report, Chief Deputy Slater described Higdem's actions while they were at PMC as follows:

> During the medical clearance Higdem began talking about someone named ["L.H."]. I asked Higdem who [L.H.] was. Higdem stated that [L.H.] was her son who was 6 months old. I asked Higdem where [L.H.] was. Higdem stated that she had left [L.H.] in the trees to protect him. At that time, I asked Higdem if she knew the contact number to any family members. Higdem provided me the number to both her mother and grandmother. I was able to contact Higdem's grandmother Kathy Poitra by using the hospital telephone. I identified myself to Higdem's grandmother and advised her of what was going on. I was able to verify that [L.H.] was not in danger and in the custody of Higdem's mother. During the assessment I observed that Presentation medical center did a Urine test, Blood draw, and chest X-ray of Higdem. It was asked to me by the doctor dealing with this patient if I needed a medical clearance. I advised the Doctor that a medical clearance is what I was there for unless he believed she needed other medical attention.
>
> Higdem kept staring at a speaker in the wall of the room stating it was a camera. I along with the doctor advised her its not a camera. Higdem also believed that we were attempting to gas her out due to having to wear face masks due to COVID-19 restrictions. At one-point Higdem stated she could hear her mother and son [L.H.] in the hallway screaming for her. I advised her no one was screaming for her.

(Ex. F at p. 2). Chief Deputy Slater testified that while they were at PMC, Higdem would alternate between walking around the evaluation room then lying down on the bed and that she would utter things out loud to him or to a speaker on the wall which Higdem apparently believed was a camera. Slater Dep. at p. 106. Nurse Obal testified that she did not remember whether she heard Higdem say that she had left L.H. in the trees, that she thought a speaker on the wall of the room was a camera, or that she thought they were trying to gas her out. Obal Dep. at pp. 120, 122. Nurse Obal testified that she could not say whether those statements of Higdem would indicate to her that Higdem was hallucinating. Obal Dep. at p. 123.

Chief Deputy Slater denied that anyone at PMC reported to him that Higdem had tested positive for methamphetamine or any other drugs during her evaluation, or that she was at risk of overdosing at the time of her evaluation. Slater Dep. at pp. 111, 147. He testified that he was given the following information upon Higdem's discharge from PMC:

> Q. Okay. So after these couple hours or so that you spent with Ms. Higdem at Presentation, what happened next?
> A. The nurse had come in with discharge papers.
> Q. Okay. And what did she tell you?
> A. I believe I asked her if there was anything. She just stated that Ms. Higdem had a UTI --
> Q. Okay.
> A. -- or a urinary tract infection. I asked her if we needed to be aware of any medications that we needed to get, and she stated that there would be a prescription at the drugstore, I believe.
> Q. Okay. Were you intending to stop and pick up that prescription before the jail?
> A. Not with her in the back of my car.
> Q. Okay.
> A. I just advised I believe staff at the jail that she would have meds ready, whether it was that day or the next day because of the -- I believe it was later in the afternoon, so -- I don't know what time the drugstore closes, but --
> Q. Okay. But that would be --
> A. -- there would be -- but there would be medications --
> Q. Okay. And that was something --
> A. -- or medication.
> Q. -- that was important that you relay to the jail?

A.    That -- that they needed to have medicine -- that she needed medicine --
Q.    Yeah.
A.    -- yes.
Q.    Okay. And it was your understanding that she had been cleared for admission
        to the jail; true?
A.    When we were discharged and we weren't needed anymore, yes, it was my
        understanding that we were good to go.

Slater Dep. at pp. 111-113. Chief Deputy Slater testified that he remembered being handed written

discharge instructions that pertained to Higdem's diagnosed urinary tract infection. Slater Dep. at pp.

113, 146. He denied that anyone at PMC advised him that Higdem should be put on special watch at

the Jail, and he testified that he would have informed jail staff if PMC had advised him that Higdem

should be monitored. Slater Dep. at p. 146.

###    D.    Higdem's Booking into the Jail

Chief Deputy Slater and Higdem departed PMC at 3:20 pm and arrived at the Jail at 3:22 pm,

as the Jail and PMC are only a few blocks apart. Slater Dep. at p. 114; (Ex. G at p. 2). He testified

that when they arrived at the Jail, he gave the discharge instructions to correctional officer Dixie

Gladue ("CO Gladue"), who booked Higdem into Jail. Slater Dep. at pp. 113, 116. Chief Deputy

Slater does not recall what, if anything, he told CO Gladue about Higdem when he transferred custody

of Higdem to her. Slater Dep. at p. 116. Chief Deputy Slater did not have any further interaction with

Higdem until he was informed that she had died approximately 9 hours later in the early morning of

June 4, 2020. Slater Dep. at pp. 119-120. He testified that he was surprised to learn she had died

because he didn't have any reason to believe that she was going to die when he had been with her

during the afternoon of the previous day. Slater Dep. at p. 130.

CO Gladue testified that when Higdem arrived at the Jail, it was her impression that she was

having a psychological issue because she was talking to somebody who wasn't really there.

Audiovisual Deposition of Dixie Gladue, January 30, 2024 ("Gladue Dep.") (**Ex. P**) at p. 18. She

testified that the Jail frequently booked inmates who appeared to be talking to people that weren't really there and that was normal behavior for an inmate. Gladue Dep. at p. 18. CO Gladue testified that when Higdem arrived at the Jail, both of the isolation cells were occupied by inmates being quarantined as a result of the North Dakota Department of Corrections & Rehabilitation's ("DOCR") COVID-19 requirements. Gladue Dep. at p. 29. She testified that Chief Deputy Slater advised her Higdem had been medically cleared at PMC prior to her arrival at Jail, but she denied that Chief Deputy Slater informed her that Higdem was under the influence of methamphetamine. Gladue Dep. at pp. 78, 81. CO Gladue testified that had Higdem's medical discharge instructions indicated that Higdem was hallucinating and high on drugs, it would have dictated how closely Higdem was monitored at the Jail. Gladue Dep. at p. 82.

CO Gladue testified that when Higdem arrived at the Jail, she performed a search and clothes changeout for Higdem, Higdem took a shower, mugshots were taken, and then they started the written portion of the booking process at 3:34 pm on charges of disorderly conduct and preventing arrest. Gladue Dep. at pp. 17-18, 113; (**Ex. Q** at pp. 1, 3-4). A video file showing Higdem being booked into the Jail is attached to the Affidavit of Grant T. Bakke as **Exhibit R**.

During booking, at 3:45 pm, Higdem made a phone call to her mother, Allen. Gladue Dep. at p. 36; (**Ex. S**). An audio file of that phone call is attached to the Affidavit of Grant T. Bakke as **Exhibit T**. During that phone call, Higdem told Allen repeatedly stated she could see Allen in the booking area. (**Ex. T**). Allen responded that she was not there and that Higdem was hallucinating. (**Ex. T**). CO Gladue testified that it appeared to her that Higdem was hallucinating during the booking process, but she denied that an inmate hallucinating is always a serious problem. Gladue Dep. at p. 37.

CO Gladue testified that she did not complete the medical assessment form during booking because Higdem was not paying attention to CO Gladue's questions, had been medically cleared right

before she arrived at the Jail, and was not a harm to herself or others. Gladue Dep. at pp. 37, 41. At 3:49 pm, Gladue placed Higdem into cell B-201, a cell with three bunkbeds with an attached bathroom with swinging saloon-style doors on the upper level of B block, where female inmates were housed at the Jail. (**Ex. Q** at p. 5). Photographs depicting B block and cell B-201 are attached to the Affidavit of Grant T. Bakke as **Exhibit U** at pp. 6-7. CO Gladue placed Higdem in cell B-201 because it was empty and CO Gladue wanted to keep Higdem separate from the other inmates so she could be observed due to her talking to herself throughout booking. Gladue Dep. at pp. 34-35. CO Gladue testified that it was her intent for the night shift correctional officers to complete Higdem's medical assessment later that evening. Gladue Dep. at p. 42.

CO Gladue testified that when Higdem arrived at the Jail she was aware that Higdem had just been medically cleared at PMC. Gladue Dep. at p. 20. She testified that an inmate being medically cleared means "they're fit for jail. There's no concerns that she needs to be on special watch or watched closer than any regular person coming in the jail." Gladue Dep. at p. 20. She further testified that she did not believe Higdem was under the influence of drugs because PMC did not provide any information in Higdem's medical clearance that she was on drugs. Gladue Dep. at pp. 58-59. CO Gladue testified that it would have been helpful if PMC had informed the Jail that Higdem was under the influence of drugs. Gladue Dep. at p. 59. CO Gladue testified that she did not put Higdem on special watch when she was booked in. Gladue Dep. at p. 21. CO Gladue testified that Higdem was likely placed on constant video monitoring once she was placed in cell B-201, meaning live video of her cell would have been placed on a bigger screen in the control room so the control room officer could keep a better eye on her. Gladue Dep. at p. 98. There were 21 inmates at the Jail including Higdem during her detention at the Jail. (**Ex. V** at p. 2).

### E.  <u>Events During the Night Shift on June 3, 2020</u>

After CO Gladue placed Higdem in her cell, she returned to Higdem's cell again approximately one hour later to bring Higdem dinner. Gladue Dep. at p. 68. CO Gladue testified that Higdem was in fine condition throughout the remainder of her shift, which ended at 6:00 pm. Gladue Dep. at pp. 112-113. When the night shift correctional officers arrived at the Jail at approximately 6:00 pm, CO Gladue advised them of Higdem's condition and told them that Higdem's medical assessment booking form had not been completed. Gladue Dep. at pp. 68-70, 73. She also advised the night shift that Higdem had been talking to herself when she was booked and to observe her closely. Gladue Dep. at p. 74. CO Gladue testified that she informed the night shift that Higdem had been medically cleared at PMC earlier that afternoon before she was booked into Jail. Gladue Dep. at p. 77.

The night shift staff at the Jail on June 3, 2020, was comprised of CO Duane Charette ("CO Charette"), CO Brunelle, and CO Azure. Audiovisual Deposition of Duane Charette, February 1, 2024 ("Charette Dep.") (**Ex. W**) at p. 24. The shift was twelve hours—beginning at 6:00 pm on June 3 and ending at 6:00 am on June 4. Charette Dep. at p. 23. Each of the three correctional officers on any given shift was assigned to one of three posts: dispatch, control, and floor. Charette Dep. at p. 32. In general, the dispatch officer handled 911 calls and dispatched officers; the control officer monitored cameras in the jail, kept the jail log, received inmate intercom messages, controlled doors within the jail, and assisted with cleaning, laundry, and meal preparation; and the floor officer performed cells checks, delivered meals and medications to inmates, and performed other tasks such as laundry and cleaning. Charette Dep. at pp. 79-80, 89; Audiovisual Deposition of April Alene Azure, April 9, 2024 ("Azure Dep.") (**Ex. X**) at p. 119. Sheriff Nathan Gustafson testified that pursuant to DOCR standards, the dispatch position is not considered a jail post. Transcript of Audiovisual Deposition of Sheriff Nathan Gustafson, April 12, 2024 ("Gustafson Dep.") (**Ex. Y**) at p. 68. The dispatch room

and control room at the Jail were adjacent to one another and connected by a door. Gustafson Dep. at p. 69.

For the floor officer to move throughout the Jail, the control room officer monitors his movement via the cameras and remotely unlocks the doors as the floor officer reaches them. Azure Dep. at p. 171. The video footage monitored by the control officer is only in real time; the control officer cannot rewind or replay any video footage. Azure Dep. at pp. 198-199. Every correctional officer at the Jail was able to work each of the three posts, and the correctional officers could rotate posts as needed during a given shift. Gustafson Dep. at pp 69-70. CO Charette testified that at shift changes, the correctional officers at each post would advise the oncoming correctional officers at the same post what had happened during the previous shift. Charette Dep. at pp. 45-46.

On the June 3 shift, CO Charette was assigned to dispatch. Charette Dep. at pp. 20-21. The dispatch officer generally handled dispatch only and was not involved in jail operations unless a need for assistance arose. Charette Dep. at p. 20. CO Azure was assigned to the control room. Azure Dep. at pp. 117-118. CO Azure testified that at the 6:00 pm shift change, she asked the day shift correctional officers if Higdem had been placed on special 15-minute cell checks. Azure Dep. at p. 109. CO Azure testified that she did not remember what the day shift correctional officers told her, but that they left her with the impression that there wasn't anything to worry about with Higdem. Azure Dep. at p. 109. She testified that she kept the live video of Higdem's cell on its own screen in the control room and that she watched her and listened to her via the cell's intercom system as frequently as she could during the night shift. Azure Dep. at pp. 165, 196-197.

CO Brunelle was the floor officer during Higdem's detention at the Jail. Audiovisual Deposition of Myles Blake Brunelle, April 8, 2024 ("Brunelle Dep.") (**Ex. Z**) at p. 11. CO Brunelle testified that the Control Log during the night shift of Higdem's detention was authored by CO Azure,

who would update the Control Log as CO Brunelle would perform cell checks. Brunelle Dep. at p. 74; (Ex. V). The Control Log indicates CO Brunelle conducted cell checks of all inmates on June 3 at 6:40 pm, 7:52 pm, 9:46 pm, and possibly 10:53 pm which indicate all inmates were "10-2," meaning ok.  Brunelle Dep. at p. 74; (Ex. V at pp. 2-3). CO Brunelle testified that physical checks of inmates are supposed to be completed on an hourly basis at irregular intervals. Brunelle Dep. at p. 290.

CO Brunelle testified that he conducted cell checks of Higdem both from the lower level of B Block and from directly outside Higdem's cell on the second floor mezzanine throughout the night shift by looking through the windows into the cell, which he believes were both acceptable methods of conducting cell checks as long as he was able to see Higdem's movement. Brunelle Dep. at pp. 70-72. CO Brunelle testified that he only conducted cell checks of Higdem's cell from the ground floor of B Block when she was standing or moving around in her cell and he was able to see her movement from the floor below. Brunelle Dep. at p. 78. CO Brunelle testified that Higdem exhibited aggressive behavior and shouted loudly from her cell, but he did not believe she was under the influence of drugs at any time. Brunelle Dep. at pp. 104-105.

CO Azure testified that she believes that at some point during the night shift CO Brunelle notified her that Higdem had urinated herself and asked CO Azure to go help her change clothes. Azure Dep. at p. 95. CO Azure entered Higdem's cell with a change of pants and underwear. Azure Dep. at pp. 93-94. With CO Azure's assistance, Higdem put on the clean pair of underwear, but did not put on the clean pants CO Azure had brought her. Azure Dep. at p. 114. CO Azure thereafter removed the soiled clothing from Higdem's cell and returned to her post in control. Azure Dep. at p. 101. CO Azure testified that Higdem was unsteady on her feet during the clothes change, but she did not know if she was legitimately unsteady or refusing to help CO Azure with changing her clothes.

- 23 -

Azure Dep. at p. 112. She testified that it is common for inmates to sway back and forth, bend over at the waist, or otherwise appear to be lacking balance, and crawl around their cells or bounce off the walls at the Jail. Azure Dep. at pp. 204-205. CO Azure testified that behavior such as that would not necessarily cause her concern for an inmate's wellbeing. Azure Dep. at pp. 204-205.

CO Azure testified that inmates urinating themselves is common behavior. Azure Dep. at p. 28. CO Charette testified that it was not uncommon for inmates to urinate themselves or require a change of underwear during night shifts and estimated he has seen that happen during his shift a "[c]ouple hundred times" throughout his career as a correctional officer. Charette Dep. at pp. 58-60. CO Azure testified ". . . I did talk to [Higdem], and I remember asking her – she looked familiar, and I asked her if she recognized me, and she mentioned my ex-husband's name. So, I mean, I'm thinking, Okay. She's coherent enough to know what I'm saying. . . ." Azure Dep. at p. 28. She testified that Higdem was able to stand on her own during the clothes change, but that she had to assist her to change her underwear. Azure Dep. at p. 29.

CO Azure testified that she did not see any injuries when she assisted Higdem with the clothes change. Azure Dep. at p. 29. When asked if it appeared to her during the clothes change that Higdem had something seriously wrong with her, CO Azure testified, "No, not – I had no idea she was seriously – I had no idea she would die. I had no idea." Azure Dep. at pp. 30-31. She testified that helping Higdem change clothes did not allow her to glean whether Higdem was on drugs or was experiencing a mental health issue. Azure Dep. at p. 100. CO Azure testified that "something was going on" with Higdem, but her condition would only be considered abnormal outside of a jail and the type of behavior exhibited by Higdem happens a lot at the Jail. Azure Dep. at pp. 100-101. She testified that when an inmate is in extreme pain and needs to go to the hospital, the correctional officers can usually see it, but if someone only urinates their pants it is not an indication that the inmate needs

to go to the hospital. Azure Dep. at pp. 103-104. CO Azure testified that she believed Higdem's behavior during the clothes change was the same behavior she had exhibited when she first arrived at the Jail earlier in the afternoon. Azure Dep. at p. 134. CO Azure testified that she brought Higdem a change of clothes as soon as CO Brunelle advised that she needed new clothes. Azure Dep. at p. 223.

CO Azure testified that after she assisted Higdem with the change of clothes, she exited Higdem's cell and was walking back to the control room when other female inmates in B block told her Higdem was "possessed." Azure Dep. at p. 25. She testified that she talked to CO Brunelle about the female inmates' comment and told him "Maybe we should get her looked at again." Azure Dep. at p. 25. CO Azure testified that CO Brunelle then contacted Office Deputy and former Jail Administrator Kim Nadeau ("Deputy Nadeau") to advise her of the situation. Azure Dep. at p. 25. CO Azure testified that CO Brunelle told her that Deputy Nadeau had told him that Higdem had already been medically cleared. Azure Dep. at p. 25. She testified that once she returned back to the control room after assisting Higdem with the clothes change, she reviewed Hidgem's discharge instructions from Dr. Cordy again. Azure Dep. at pp. 212-213. CO Azure testified that had Higdem's discharge instructions told jail staff to watch for signs of a drug overdose, she would have been treated differently. Azure Dep. at p. 36. She testified that Higdem would have been put on 15-minute watches had the discharge instructions stated Higdem was under the influence of methamphetamine. Azure Dep. at p. 37.

CO Azure testified that she watched Higdem's movement from the control room, and that when Higdem lied down and stopped moving, she thought Higdem had fallen asleep. Azure Dep. at p. 165. CO Brunelle testified that after Higdem fell asleep, he performed the next cell check from just outside the window of her cell and saw that she had shifted how she was lying on the bunkbed. Brunelle Dep. at p. 72.

CO Azure testified that shortly after midnight she opened the door for CO Brunelle to enter Higdem's cell to perform a cell check. Azure Dep. at p. 168. She testified that she saw CO Brunelle check Higdem for a pulse on cell video from the control room, and immediately realized she needed to call for an ambulance. Azure Dep. at p. 168. CO Charette testified that CO Brunelle thereafter came into the control room and said that Higdem was not breathing. Charette Dep. at pp. 41-42. He testified that CO Brunelle appeared pale and surprised when he made that statement. Charette Dep. at p. 68. He testified that he then ran to Higdem's cell and performed CPR until paramedics arrived. Charette Dep. at pp. 41, 43. CO Charette testified that he had Emergency Medical Responder training above what other County correctional officers received in training because he was also a certified peace officer. Charette Dep. at p. 147. CO Azure testified that she believes CO Brunelle came to the control room rather than beginning CPR on Higdem when he found her not to have a pulse because CO Charette had a higher level of medical training than CO Brunelle. Azure Dep. at p. 169.

CO Brunelle provided the following narrative regarding his thought process when he entered Higdem's cell shortly after midnight and found her not breathing:

> [I thought] Get an ambulance. Get her -- honestly, that -- what's his name asked a question similar to that, and I know we should have, well, start CPR. Well, I froze, basically, I think. I -- I don't know if you want to call it a -- I don't know what to call it. It's just like I never dealt with -- it was like -- it seemed like -- I don't know. I don't know if she -- it seemed like she was dead already or something or -- or -- or whatever, but there was -- there was a horrible smell, and I just, "Oh, my God," and it was like a -- what do you want to call it? -- a fight-or-flight-type thing that everyone has. Everyone has that, and that's what you -- you're -- you're either going to deal with it, or you're going to (descriptive sound). And apparently, mine is -- is flight.

Brunelle Dep. at pp. 109-110.

The Control Log provides that CO Brunelle began cell checks at 12:22 am on June 4 and he noticed Higdem was not breathing at 12:23 am. (Ex. V at p. 3). An ambulance was called and arrived on the scene at 12:27 am. (Ex. V at p. 3; **Ex. AA** at p. 2). Ambulance staff took over life-saving

measures from CO Charette at 12:27 am. (Ex. V at p. 3). Life-saving measures were unsuccessful, and ambulance staff called Dr. Cordy to ask whether they should continue attempting to resuscitate Higdem. (Ex. AA at p. 1). Dr. Cordy instructed ambulance staff to discontinue life-saving measures, and ambulance staff pronounced Higdem deceased at 12:42 am. (Ex. AA at p. 1).

An autopsy of Higdem was conducted by Walter Kemp, MD, PhD on June 4, 2020. (**Ex. BB**). The autopsy provides that Higdem's postmortem chemistries revealed the presence of amphetamine and methamphetamine in Higdem's system. (Ex. BB at p. 1). Dr. Kemp did not find any indication of lethal trauma and opined that Higdem's cause of death was methamphetamine toxicity, and the manner of death was accidental due to Higdem's use of illicit substance. (Ex. BB at p. 2).

### F.  Expert Opinions and Testimony

County Defendants have disclosed two retained experts who have provided opinions in this case: Board Certified Emergency Medicine expert Dr. Gordon Leingang and Jail Operations expert Jeff Eiser ("Eiser"). As to the discharge instructions Dr. Cordy provided for Higdem, Eiser opines in his report:

> It is concerning to me, from a jail operational perspective, that PMC medical staff did not share, on Ms. Higdem's medical clearance paperwork, any information concerning her admission of that she was "smoking methamphetamine today" (as charted by Dr. Cordy) and "is high on meth/drug use" (as charted by RN Obal). This is critical information for a jail facility to help decide if they will accept a prisoner and one of the basic reasons why Ms. Higdem would be taken to a medical facility before the jail could accept her at the jail. As viewed from a jail operational perspective, the RCJ supervision and staff had no actual knowledge of Ms. Higdem's recent drug use on June 3, 2020, which more likely than not, would have had a direct effect on where RCJ staff housed her and whether she needed to be placed on a 15-minute medical and/or safety watch while they waited for her to be able to complete the booking process. It is an expected and routine practice for jail staff to always defer to medical staff when it comes to making medical decisions for an inmate, jail staff are taught to follow medical directions at all times. Again, this is why it concerns me from a jail operational perspective that PMC medical staff did not share important information concerning the current health condition of Ms. Higdem on her medical clearance form, other than she had a "Urinary Tract

Infection" with directions to "Push fluids" and administer "Bactrim DS 1 pill twice a day x 7 days".

(Eiser Report (**Ex. CC**) at p. 12). In forming his opinions, Eiser analyzed all available video from the Jail depicting Higdem and did not see anything that would alert a reasonable correctional officer that Higdem was experiencing a medical emergency:

> The case record indicates Ms. Higdem had access to adequate medical assessment, care, and treatment when she arrived at the facility and during her entire incarceration inside the facility. The case video record does not indicate any significant changes in Ms. Higdem condition before she appeared to lay down and fall asleep in her cell in B Pod, other than when she soiled herself and had her interaction with Officer Azure during the clean clothing exchange, when she mentioned the name of Officer Azure's husband (at that time) as if she knew him.

(Ex. CC at p. 16). It is Eiser's opinion that Higdem's act of soiling herself would not indicate to a reasonable correctional officer that she had a medical emergency. (Ex. CC at p. 14). Eiser further opined that "a slight lack of balance and inability to change clothes does not indicate a medical emergency from a jail operational perspective, as it is common for newly-booked inmates to exhibit a lack of balance due to intoxication or other factors.[]" (Ex. CC at p. 14)

Drawing on his nearly thirty years of practical experience in jail operations, Eiser opines that there is no evidence indicating CO Azure or CO Brunelle were aware of any serious medical need of Higdem or deliberately disregarded it:

> Based upon my training, education and experience it would be reasonable for Officer Azure to believe that based upon her personal interactions with Ms. Higdem in her cell during the clothing exchange and later observations on the cell video of her laying down and appearing to fall asleep, that her condition seemed to be stabilizing (from her earlier behavior) and did not indicate any imminent medical emergency. . . . The case record indicates RCJ supervision and staff (including Officer April Azure and Myles Brunelle) acted appropriately at all times based upon what they actually knew about Ms. Higdem's serious medical needs and it contains no evidence RCJ supervision and staff (including Officer April Azure and Myles Brunelle) had any actual knowledge of any imminent threat to the health and safety of Ms. Higdem or made any conscious choice to ignore any serious medical needs of Ms. Higdem.

(Ex. CC at pp. 2, 17-18). Eiser's report concludes:

> It is my opinion the case record contains no evidence of RCJ supervision and staff (including Officers April Azure and Myles Brunelle) ignoring any known risk to the safety, and/or any serious medical needs of Ms. Higdem. I have watched the entirety of the jail videos I have been provided in this case, just as I have done in my own experience as a jail administrator, and the unfortunate reality is it appears even placing Ms. Higdem on 15-minute checks, more likely than not, would not have changed the outcome in this case, as it appears Ms. Higdem was booked, paced around her cell, exhibited behaviors common to newly admitted inmates, received her meal tray and appeared to eat, used the bathroom, interacted with Officer Azure during the clothing exchange, and then appeared to lie down on her bed and eventually going to sleep, as is common for newly-booked inmates to do.

(Ex. CC at pp. 25).

Dr. Leingang watched "every minute, every second of [the] videotapes [of Higdem at the Jail] more than once" and also came to the conclusion that Higdem never exhibited any behavior at the Jail indicating she was experiencing a medical emergency. Transcript of Audiovisual Deposition of Dr. Gordon Leingang ("Dr. Leingang Dep.") (**Ex. DD**) at pp. 40, 104-105.[5] In that regard, Dr. Leingang testified, "I would submit to you that she appeared to have finally fallen asleep after a busy day of tweaking. And so what was happening on camera was not all together concerning. She wasn't in respiratory distress. She was still moving her extremities. She -- she did not have a seizure. So for all practical purposes, she looked as though she fell asleep, which is to be expected." Dr. Leingang Dep. at pp. 104-105.

Dr. Leingang also testified that any issues with balance Higdem may have had at the Jail did not indicate a medical emergency. Dr. Leingang Dep. at p. 108 ("Although there were several instances where she lost her balance momentarily, she . . . always regained . . . her balance right away and never fell. This is a common behavior for a person intoxicated on meth -- and I'll interject, like -- much like alcohol, for example -- and does not present an emergency -- a medical emergency.").

---

[5] Video files depicting the entirety of Higdem's detention at the Jail in chronological order are attached to the Affidavit of Grant T. Bakke as **Exhibits EE**, **R**, **FF**, **GG**, **HH**, **II**, **JJ**, **KK**, **LL**.

Based on his analysis of the jail videos, it is Dr. Leingang's opinion as an expert in emergency medicine that Higdem's condition did not appear to have worsened or improved from the time she was booked into the Jail until the time she was found unresponsive by CO Brunelle. Dr. Leingang Dep. at pp. 104-105.

## IV.    LEGAL STANDARD – SUMMARY JUDGMENT

The applicable summary judgment standard of review is as follows:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Such a showing shifts to the non-movant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. The non-movant must show there is sufficient evidence to support a jury verdict in his favor. Factual disputes that are irrelevant or unnecessary will not be counted, and a mere scintilla of evidence supporting the non-movant's position will not fulfill the non-movant's burden.

*Uhiren v. Bristol-Meyers Squibb Company, Inc.*, 346 F.3d 824, 827 (8th Cir. 2003) (citations and quotations omitted). "The basic inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376 (8th Cir. 1996) (quoting *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 251-52 (1986)). A nonmoving party has the burden of demonstrating to the district court that at trial it may be able to put on admissible evidence proving its allegations. *JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995) (citing *Anderson*, 477 U.S. at 256-57). Under Rule 56 of the Federal Rules of Civil Procedure, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

V.      **ANALYSIS**

A.      **Allen's Deliberate Indifference Claims Against CO Brunelle and CO Azure**

Allen's claims against CO Brunelle and CO Azure under 42 U.S.C. § 1983 should be analyzed under the Fourteenth Amendment's Due Process Clause and not the Eighth Amendment. In her Amended Complaint, Allen alleges CO Brunelle and CO Azure violated Higdem's Eighth Amendment and Fourteenth Amendment rights by being deliberately indifferent to her serious medical needs, thereby playing a direct and substantial role in her death. *Am. Compl.* (Doc. 10) at ¶ 129. There is no dispute that at the time of the events at issue, Higdem was detained at the Jail on charges of Disorderly Conduct and Preventing Arrest. *Am. Compl.* (Doc. 10) at ¶ 67. In other words, she was a pretrial detainee, as she had not been convicted or sentenced on the charges. A "[p]retrial detainee § 1983 claims are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment prohibition of cruel and unusual punishment." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011). As explained by the United States Court of Appeals for the Eighth Circuit:

> Under the Fourteenth Amendment, "'[d]eliberate indifference' entails a level of culpability equal to the criminal law definition of recklessness, that is, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). "The standard for evaluating a substantive due process claim is whether the alleged 'behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Schmidt v. City of Bella Villa*, 557 F.3d 564, 574 (8th Cir. 2009) (quoting *Rogers v. City of Little Rock*, 152 F.3d 790, 797 (8th Cir. 1998)).

*Awnings v. Fullerton*, 912 F.3d 1089, 1101-02 (8th Cir. 2019). To establish a Due Process violation based on deliberate indifference, a plaintiff must:

> demonstrate that he suffered from an objectively serious medical need, and that [defendant] had an actual knowledge of that need but deliberately disregarded it. A medical need is objectively serious if it is supported by medical evidence, such as

a physician's diagnosis, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.

*Bailey v. Feltmann*, 810 F.3d 589, 593-94 (8th Cir. 2016) (citations and quotation omitted). In evaluating whether a defendant deliberately disregarded a risk, the court considers the "actions in light of the information [the defendant] possessed at the time, the practical limitations of [the defendant's] position and alternative courses of action that would have been apparent to an official in that position." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quoting *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000)). Whether an excessive risk to health or safety was known or obvious "must be viewed from [the defendant's] perspective at the time in question, not with hindsight's perfect vision." *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir.1998) (citing *Williams v. Nebraska State Penitentiary*, 57 F.3d 667, 669 (8th Cir.1995)).

As Allen's 42 U.S.C. § 1983 claims are asserted against CO Brunelle and CO Azure in their individual capacities, it is Allen's burden to prove both CO Brunelle was deliberately indifferent to Higdem's serious medical need *and* CO Azure was deliberately indifferent to Higdem's serious medical need; the conduct of one individual cannot be imputed to the other. "Personal-capacity suits seek to impose personal liability upon a government officer for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985). "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association." *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) (internal quotation marks omitted).

The deliberate indifference standard has both objective and subjective prongs. The plaintiff must prove "that [s]he suffered from an objectively serious medical need" and "that [Defendants] actually knew of but deliberately disregarded h[er] serious medical need." *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014). To sustain her deliberate indifference claims against CO Brunelle

and CO Azure under 42 U.S.C. § 1983, Allen must establish both objective and subjective prongs: (1) that Higdem suffered from a serious medical need that presented a substantial risk of serious harm; and (2) that CO Brunelle and CO Azure each "[knew] of and disregard[ed] an excessive risk to [Higdem's] health or safety," the subjective component. *Letterman v. Does*, 789 F.3d 856, 861–62 (8th Cir. 2015) (citations and quotations omitted).

In this case, the undisputed facts establish that Higdem had been evaluated at PMC and medically cleared for jail by Dr. Cordy minutes before she was booked into the Jail. It is also undisputed that the discharge instructions Dr. Cordy provided upon Higdem's discharge from PMC indicated that he had diagnosed her with a urinary tract infection, but do not mention that Higdem had tested positive for drugs including methamphetamine during the evaluation or that Higdem was still intoxicated at the time she was discharged from PMC—an error which Dr. Cordy himself testified was significant. There is no evidence establishing that either CO Brunelle or CO Azure was informed that Higdem was intoxicated on methamphetamine (or other drugs) at any time. Rather, both CO Brunelle and CO Azure expressly denied that they were informed about Higdem's methamphetamine intoxication. Therefore, neither CO Brunelle nor CO Azure was aware of facts from which they could infer Higdem was at a substantial risk of serious harm related to methamphetamine intoxication. For that reason alone, Allen's deliberate indifference claims against CO Brunelle and CO Azure fail.

Further, neither CO Azure nor CO Brunelle drew the inference that Higdem was ever at risk of serious harm related to methamphetamine intoxication. The undisputed evidence proves CO Azure did not become aware that Allen had any serious medical need until CO Brunelle entered Higdem's cell just after midnight on June 4 and found she was not breathing, at which point CO Azure immediately attempted to obtain medical attention for Higdem by assisting CO Brunelle

and CO Charette in obtaining an ambulance. CO Azure expressly denied ever knowing Higdem had any serious medical need at any time. For example, when she was asked if she thought Higdem had something seriously wrong with her when she brought her a change of clothes after Higdem had urinated herself, CO Azure testified "No, not – I had no idea she was seriously – I had no idea she would die. I had no idea." Azure Dep. at pp. 30-31.

Even though CO Azure testified that she did not consider Higdem urinating herself to constitute a serious medical problem, she still: (1) brought Higdem a change of clothes; (2) assisted Higdem by helping her put on a new pair of underwear; and (3) remove the soiled clothes from Higdem's cell. Far from showing CO Azure was deliberately indifferent to Higdem, these actions show CO Azure deliberately tried to help Higdem and make her more comfortable.

Allen's constitutional claim against CO Brunelle fails for similar reasons. CO Brunelle specifically testified that he did not see anything that concerned him during his observations of Higdem throughout the night shift. He testified that he was told she had been acting crazy or aggressive during the day shift, but he explained that a newly-booked inmate acting crazy or aggressive was completely normal at the Jail. As with CO Azure, CO Brunelle's undisputed testimony establishes he was not aware of any serious medical need of Higdem until he found she was not breathing during a cell check. And while CO Brunelle's reaction to finding Higdem in that condition may not have been exemplary, he testified that the stress of the situation overwhelmed him, so he immediately sought assistance from the other correctional officers to assist him with addressing Higdem's medical need. In other words, he did not disregard Higdem's medical need but rather deliberately sought to seek help for Higdem.

As explained in Eiser's expert report and Dr. Leingang's testimony, it was entirely reasonable for CO Azure and CO Brunelle to conclude that Higdem—even though she may have

showed signs of drug intoxication or possible mental health issues—did not exhibit any behavior indicating she had a serious medical need at any time until she was found not breathing by CO Brunelle. As Dr. Leingang testified, Higdem acted like someone who was under the influence of methamphetamine and then appeared to go to sleep, as commonly occurs without adverse consequences in jail settings. As the possibility of Allen proving either CO Brunelle or CO Azure was deliberately indifferent to Higdem's serious medical needs is entirely foreclosed, her Fourteenth Amendment due process claims against them should be dismissed with prejudice.

### B.   CO Brunelle and CO Azure are Entitled to Qualified Immunity

Even assuming, arguendo, either CO Brunelle or CO Azure violated Higdem's constitutional rights, which County Defendants deny, each would nonetheless be entitled to qualified immunity. As summarized by the United States Court of Appeals for the Eighth Circuit in the context of a claim of deliberate indifference to serious medical need under the Eighth or Fourteenth Amendments:

> Qualified immunity "shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Ivey v. Audrain Cnty.*, 968 F.3d 845, 848 (8th Cir. 2020) (quoting *Thiel v. Korte*, 954 F.3d 1125, 1128 (8th Cir. 2020)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S .Ct. 1092, 89 L. Ed. 2d 271 (1986)). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).
>
> Qualified immunity analysis involves two inquiries: (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Courts have liberty to choose the order of addressing the inquiries. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

> Showing that a right was clearly established requires identifying controlling precedent with a close correspondence to the particulars of the present case. *Anderson v. Creighton*, 483 U.S. 635, 639–41, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987); *Mullenix*, 577 U.S. at 12, 136 S. Ct. 305 (stating that the analysis requires considering the "*particular* conduct" and the "specific context" (internal quotation marks omitted)). This means that the right in question must be construed fairly narrowly and that facts in the present case must align with facts in precedent. *See Ivey*, 968 F.3d at 849 (reversing the district court for defining the right at issue too broadly). In effect, this standard requires a close examination of the facts to determine what right is at issue and thus whether qualified immunity is appropriate.

*Rusness v. Becker Cnty., Minnesota*, 31 F.4th 606, 614–15 (8th Cir. 2022).

With respect to the first qualified immunity factor of "whether there has been a violation of a constitutional right", as explained above, the undisputed facts establish Higdem's constitutional rights were not violated by CO Brunelle or CO Azure. In addition, even if a constitutional violation occurred, which there is no evidence to support, they would each nonetheless be entitled to qualified immunity under the second factor of "whether that right was clearly established at the time of the violation." There was no controlling precedent as of June 2020 having a close correspondence to the particulars of the present case finding a constitutional violation for deliberate indifference. In other words, as of June 2020, there was no case law with sufficiently clear contours that provided notice to CO Brunelle and CO Brunelle that their actions violated a right, and certainly no "existing precedent [which has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

Rather, the Eighth Circuit has made clear that if the symptoms presented by an inmate are not easily recognizable medical issues, then the serious medical need is not obvious to a layperson and thus no constitutional violation occurred. *See Reece v. Hale*, 58 F.4th 1027, 1033-34 (8th Cir. 2023) (no obvious medical need where detainee's condition at jail deteriorated over a period of hours until he was taken to hospital and died due to methamphetamine toxicity where detainee had exhibited behaviors at jail including making absurd, random comments, being obnoxious, and

sweating profusely); *Jones v. Minn. Dep't of Corrections*, 512 F.3d 478, 482-83 (8th Cir. 2008) (no obvious medical need where inmate was unable to stand or walk under her own power, was "google-eyed" and unresponsive, rolling on the ground while grunting and groaning, bleeding from the mouth, smelled of urine, and breathing rapidly); *Grayson v. Ross*, 454 F.3d 802, 809-10 (8th Cir. 2006) (same where detainee was found in a creek, soaking wet; was combative; gave nonsense answers to questions; began screaming while in the holding cell; and officers were aware that detainee had taken meth). "[A]n officer does not lose the protections of qualified immunity merely because he does not react to all symptoms that accompany intoxication." *Thompson v. King*, 730 F.3d 742, 748 (8th Cir. 2013); *see also Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) ("[M]ost individuals arrested on intoxication-related charges are not in obvious need of prompt medical care. . . ."); *Martinez v. Beggs*, 563 F.3d 1082, 1090 (10th Cir. 2009) ("The officers subjectively knew that [the inmate] was intoxicated, but there is no evidence to show that anyone would have known that [the inmate] would face an imminent heart attack or death, much less that the individual county defendants subjectively knew that [the inmate] was at risk of heart attack or death."). When jail officials have no background knowledge regarding an inmate's medical condition and the inmate presents symptoms which are not easily recognizable medical issues, the inmate's serious medical need cannot be considered so obvious that a layperson should have recognized it. *Jones v. Minn. Dep't of Corrections*, 512 F.3d 478, 482-83 (8th Cir. 2008).[6] "Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors or dentists."

---

[6] Further, "if medical professionals fail[] to grasp the seriousness of [an inmate's] condition, prison staff without medical training [cannot] [be] expected to do so." *Rusness v. Becker Cty., Minn.*, 31 F.4th 606, 616 (8th Cir. 2022); *Roberts v. Kopel*, 917 F.3d 1039, 1043 (8th Cir. 2019) ("It is well-established that, '[i]f trained health care officials could not find a serious medical need in these circumstances, then we decline to hold that a reasonable lay person should have done so.'")

*Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) (citing *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir.1995)). County Defendants have not located any controlling precedent involving a situation where a detainee is medically cleared for jail by a physician who provides discharge instructions to the jail that fail to mention the most serious medical condition of the detainee yet hold the jail staff liable for a constitutional violation for failing to ferret out the physician's clinic mistakes.

### C.   Allen's *Monell* Claim Fails for Lack of Constitutional Violation by any Individual Cass County Defendant.

"[A] municipality cannot be held liable under Section 1983 if its employees did not commit a constitutional violation." *Glover v. Rodriguez*, No. 22-CV-1454 (NEB/TNL), 2024 WL 689752, at *3 (D. Minn. Jan. 26, 2024). To the extent the Court grants summary judgment to CO Brunelle and CO Azure – whether because of qualified immunity or because Plaintiffs will be unable to prove all the essential elements of their deliberate indifference claim based on the undisputed facts – Allen cannot sustain her *Monell* claims against County. Therefore, those claims are subject to judgment as a matter of law.

### D.   Alternatively, Allen's *Monell* Claim Fails Because the Undisputed Facts Show She Cannot Prove up the Essential Elements to Sustain It

In her Amended Complaint, Allen asserts a claim against County arising from alleged unconstitutional customs, patterns, and practices. A governmental entity may only be held liable for constitutional violations resulting from a policy or custom of the entity. *See Turney v. Waterbury*, 375 F.3d 756, 761-62 (8th Cir. 2004); *Liebe v. Norton*, 157 F.3d 574, 578-79 (8th Cir. 1998). The policy or custom needs to be the "moving force" behind the violation. *See Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985). A plaintiff may show a governmental entity's deliberate indifference through lack of training or inadequate training brought on by inadequate

policies or customs. *See Harvey v. Cty. of Ward*, 352 F.Supp.2d 1003, 1012 (D.N.D. 2005). The

U.S. Supreme Court has held, "Only where a [governmental entity's] failure to train its employees

in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a

shortcoming be properly thought of as a [governmental entity] 'policy or custom' that is actionable

under § 1983." *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989). To establish deliberate

indifference by a governmental entity a plaintiff must show: (1) that the policy or custom existed;

(2) that the policy or custom was causally related to the plaintiff's injury; and (3) that the policy

itself was unconstitutional. *See Patzner*, 779 F.2d at 1367.

Here, Allen's claim that County maintained unconstitutional customs, patterns, and

practices is not supported by the evidence. County Defendants' jail operations expert Eiser opines

it was reasonable, appropriate, and consistent with corrections industry standards for CO Gladue

to rely upon the medical clearance information provided by PMC to accept Higdem into the Jail

and for CO Gladue to place Higdem in a temporary observational housing unit until Higdem was

able to cooperate with completing the booking process. (Ex. CC at pp. 10-11). Eiser also opines

that Jail staff operated substantially consistent with North Dakota Correctional Facility Standards

set by statute. (Ex. CC at pp. 25).

Allen cannot make any evidentiary showing that there were any unconstitutional customs,

patterns, or practices at the Jail that were the moving force behind any violation of Higdem's

constitutional rights or that played a direct and substantial role in causing her death. As such,

Allen's *Monell* claim against County should be dismissed with prejudice.

### E.    There is No Evidence to Support Allen's Claim for Punitive Damages Against CO Brunelle and CO Azure

Allen asserts she is entitled to an award of punitive damages against CO Brunelle and CO

Azure pursuant to federal common law under *Smith v. Wade*, 461 U.S. 30 (1983). *Am. Compl.*

(Doc. 10) at ¶ 134. "Punitive damages may be assessed in a § 1983 case when a 'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Swipies v. Kofka*, 419 F.3d 709, 718 (8th Cir. 2005) (quoting *Smith*, 461 U.S. at 56). "A finding of deliberate indifference to a serious medical need, while establishing liability under § 1983, does not necessitate a finding of callous indifference warranting punitive damages." *Coleman v. Rahija*, 114 F.3d 778, 788 (8th Cir. 1997) (collecting cases); *see also Ivey v. Wilson*, 832 F.2d 950, 956 (6th Cir.1987) (punitive damages award was improper where there was no evidence that defendants were acting in bad faith or harbored any ill will towards plaintiff). There is no evidence to sustain Allen's claim for punitive damages. No testimony or documentary evidence suggests any actions of CO Brunelle or CO Azure toward Higdem were motivated by evil intent or taken in callous indifference to her constitutional rights. Higdem and CO Brunelle were perfect strangers when Higdem arrived at the Jail, and no reasonable jury could find Higdem's conversation with CO Azure at the Jail evinced any ill will of CO Azure toward Higdem. There is not one scintilla of evidence to support Allen's claim for punitive damages and it should be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, County Defendants request all of Allen's claims against them be dismissed with prejudice.

Dated this 16th day of December, 2024.

BAKKE GRINOLDS WIEDERHOLT

By: */s/ Grant T. Bakke*
      Randall J. Bakke (#03989)
      Shawn A. Grinolds (#05407)
      Grant T. Bakke (#09106)
      300 West Century Avenue
      P.O. Box 4247
      Bismarck, ND 58502-4247
      (701) 751-8188

rbakke@bgwattorneys.com
sgrinolds@bgwattorneys.com
gbakke@bgwattorneys.com

Attorneys for Defendants Myles Brunelle, in his individual capacity; April Azure, in her individual capacity; and Rolette County.

### CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2024, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MYLES BRUNELLE, APRIL AZURE, AND ROLETTE COUNTY'S MOTION FOR SUMMARY JUDGMENT** was emailed to the following:

Andrew J. Noel
Marc E. Betinsky
Julie Moroney
Robins Kaplan LLP
800 LaSalle Avenue
Ste 2800
Minneapolis, MN 55402
anoel@robinskaplan.com
mbetinsky@robinskaplan.com
jmoroney@robinskaplan.com

Timothy Q. Purdon
Robins Kaplan LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58503
tpurdon@robinskaplan.com

Megan J. Flom
Randall S. Hanson
Camrud, Maddock, Olson & Larson, LTD
PO Box 5849
Grand Forks, ND 58206-5849
mflom@camrudlaw.com
rhanson@camrudlaw.com

By: */s/ Grant T. Bakke*
GRANT T. BAKKE