### UNITED STATES DISTRICT COURT
### DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Jessica Allen, individually and on behalf of the heirs at Law of Lacey Higdem, | ) ) ) | Civil No. 3:22-CV-93 (PDW/ARS) |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Myles Brunelle, in his individual capacity; April Azure, in her individual capacity; Rolette County; Roy Cordy, MD; and Presentation Medical Center, | ) ) ) ) ) | |
| Defendants. | ) | |

## INTRODUCTION

The County[1] Defendants' Motion for Summary Judgment is as incredible as it is wrong. Lacey Higdem, an otherwise healthy 19-year-old woman, came into the Rolette County Jail (the "Jail") obviously under the influence of drugs. She died nine hours later, after deteriorating in real time, on camera, for Correctional Officers ("COs") April Azure and Myles Brunelle to see. The Defendant COs knew something was wrong, but didn't care. They were too busy having an affair and watching movies to pay Lacey attention. When they did talk about Lacey, it was mostly to make fun of her—as revealed on audio inadvertently uncovered after the County Defendants filed this motion, which only highlights the outright falsities upon which their motion is based.

The County Defendants' malfeasance resulted in an unprecedented trifecta for a North Dakota correctional institution. First, the State of North Dakota took the drastic step of ***shutting down the Jail*** following Lacey's death because its continued operation presented an "ongoing

---

[1]     Plaintiff Jessica Allen uses the term "County Defendants" to refer to Defendants Myles Brunelle, April Azure, and Rolette County.

danger." Second, the State brought criminal charges against Azure and Brunelle based on the investigation conducted by North Dakota Bureau of Criminal Investigation ("BCI") Special Agent Craig Zachmeier, who testified that this was the worst conduct he has seen at a jail in his twenty years of experience. And third, Defendants Azure and Brunelle pleaded guilty to those criminal charges. To make this case even more unusual, the County Defendants' *own expert*, Dr. Gordon Leingang, opined that had the "hapless" jail staff done their jobs that night, Lacey might have been saved. And yet they want civil exoneration?

The County Defendants do not mention any part of this trifecta in their recitation of the facts, which should have been stated in the light most favorable to Plaintiff. Their silence speaks volumes. There are zero citations to testimony by the two individuals who investigated the in-custody death. The only experts the County Defendants cite are their own, and even that they do selectively, sidestepping the fact that one expert testified there were important factual disputes for a jury to resolve, and the other testified he was so outraged by what he saw on the video that he had to comment on the COs' failures to do their jobs.[2]

A cherrypicked version of facts can be used to uphold a jury verdict in one party's favor, but not to deprive Plaintiff of her rights under Federal Rule of Civil Procedure 56. As the parties moving for summary judgment, it is the County Defendants' burden to establish the absence of any genuine disputes of material fact. In order to show the *absence* of any factual disputes, the County Defendants must first acknowledge *all* of the facts. Rewarding the County Defendants

---

[2]    Not content to *ignore* unfavorable facts, the County Defendants also filed two motions in limine to *exclude* certain evidence altogether. Dkt. 66, 70. They have since withdrawn their motion to exclude the control-room video, tacitly acknowledging it was based on false statements—a sworn affidavit by the County Sheriff—exposed by the late-discovered audio. Dkt. 93; Noel Decl. Ex. 1, Sheriff's Affidavit. The COs' criminal charges are the subject of the other motion, Dkt. 66, which Plaintiff opposes in a separate memorandum.

with summary judgment in these circumstances would make a mockery of Rule 56.

## BACKGROUND

I.    **The Jail's documented history of problems before Lacey arrived**

Long before Lacey ever set foot in the Jail, it had serious and known problems. The state agency tasked with inspecting jails, the North Dakota Department of Corrections and Rehabilitation ("DOCR"), repeatedly documented violations regarding inmate observation and intoxication management.[3] The issues began no later than 2018, with the in-custody death of Oscar Wilkie. State law and Jail policy require COs to conduct cell checks on inmates at least once per hour. Any inmate under the influence of drugs or alcohol, however, is considered a "special needs" inmate, for whom the Jail requires 15-minute checks. Noel Decl. Ex. 3,[4] Jail Policies, at RC0055. Two years before Lacey died, COs at the Jail booked Wilkie, who had trouble walking and told COs he had used meth. Ex. 4, Wilkie Reports at DOCR 3891, BCI.4.009. He had not been medically cleared by a doctor. *Id.* Despite knowing he was intoxicated, COs conducted hourly, not 15-minute, checks on him, and he later died. *Id.* at BCI.4.009; Ex. 5, Zachmeier 17-21.[5]

Several months later, at the DOCR's 2018 annual inspection, investigators found the Jail again violated its policies (and thus DOCR standards) regarding special-needs inmates and inmate observation, because COs failed to conduct and document 15-minute checks on inmates who qualified as having special needs. Ex. 6, 2018 Inspection at DOCR-000785-86, DOCR-000789.

---

[3]    North Dakota law requires the DOCR to prescribe rules establishing minimum standards for jails, and the DOCR promulgated its Correctional Facility Standards pursuant to that authority. N.D.C.C. § 12-44.1-24; Ex. 2, 2020 Standards. The DOCR inspects jails and issues a report of noncompliance if a jail violates any of the standards, state law, federal law, or DOCR rules. *Id.*

[4]    True and correct copies of all exhibits cited in this memorandum are attached to the Declaration of Andrew J. Noel, filed on January 27, 2025, with this memorandum.

[5]    After the initial citation with exhibit number, deposition transcripts are cited by last name and page number. First initial is used to distinguish witnesses with the same last name.

The DOCR documented similar problems at the Jail's 2019 inspection. Among other areas of noncompliance, the DOCR determined the Jail again violated the standard regarding inmate observation because COs booked an intoxicated inmate and then failed to adequately observe, interact, and communicate with him. Ex. 7, 2019 Inspection at DOCR-003799; Ex. 8, DOCR Mortality Review at DOCR-003174. Jail leadership at the time, including then-Jail Administrator Kim Nadeau,[6] assured the DOCR that the Jail would review special watches with staff. Ex. 10, Special Watch Email at RC0471.

In addition to concerns about the Jail's noncompliance, the DOCR also began to harbor serious concerns about the Jail's culture. Soon after the 2019 inspection, Lance Anderson, the DOCR inspector, reported the Jail had a culture of "doing things to just get b[y] or just enough to not have the state give them an order of non-compliance." Ex. 11, DOCR September 2019 Report at DOCR-002702. Anderson had "direct conversations" with Jail leadership "about this culture and the need to not run [the DOCR] in circles." *Id.* Several months later, the DOCR expressed the problem in even stronger terms:

> -We completed the Rolette County Jail inspection and report this month, however we have been struggling with dishonesty and attention to matters, which need attention. We have another inspection scheduled to review the corrections and likely will need to pursue an order after this visit.

Ex. 12, November 2019 Report at DOCR-002707. The DOCR hoped things would change after Nathan Gustafson was elected sheriff and promised to take over as Jail Administrator.[7] Ex. 14, Corrective Action Visit Memo; Ex. 15, Anderson 77-78. But the culture of chaos, noncompliance, complacency, and dodging accountability continued under his watch and per his orders.

---

[6]     Despite the important duties of Jail Administrator as set by state law, *see* N.D.C.C. § 12-44.1-04, Nadeau described her role at this time as the "sheriff's secretary." Ex. 9, Nadeau 11.

[7]     At the time of Lacey's death, Jail employees didn't know who the Jail Administrator was, or whether it was Nadeau or the Sheriff. *Compare* Dkt. 92-1, Brunelle 122; Dkt. 92, Azure 33; *with* Dkt. 77-10, Gladue 15; Ex. 13, B. Charette 23; Dkt. 77-17, D. Charette 92.

## II.    Law enforcement finds Lacey high in a field and in need of help

Bureau of Indian Affairs Officer Animikig Laverdure responded to a call on the Turtle Mountain Indian Reservation around 12:20 pm on June 3, 2020, regarding a woman screaming for help in the trees - Lacey. Ex. 16, Laverdure 31-32; *see also* Dkt. 77-3, Laverdure Report. Upon arriving on scene, Laverdure could immediately tell Lacey was under the influence of an illegal substance. Laverdure 44. She ran toward him yelling "kill me" and "please shoot me," her hair was messy and full of sticks, her clothes and skin were dirty, her legs were scratched up, and her speech was fast and "all over the place." *Id.* at 38-44. Lacey was combative, and Laverdure had to subdue her on the ground. *Id.* at 46-49. A tribal officer with the Belcourt Police Department and a paramedic team arrived to support Laverdure. *Id.* at 49-50, 74. The officers handcuffed Lacey and put her in a squad car, but she began banging her head on the cage. *Id.* at 61-63. Lacey hallucinated and had delusions, telling the officers there were "black guys chasing her in the trees," she had "100 babies" that needed to be saved, and they needed to "save the trees along with all different races of people in the trees." *Id.* at 21-22, 66. Because Lacey was not an enrolled member of the Turtle Mountain tribe, the officers requested support from the Rolette County Sheriff's Office. *Id.* Rolette County Deputy Mitch Slater responded. *Id.* Lacey told him she had used methamphetamine that day and said she had a pipe in her bra. *Id.* No pipe was found, but the searched turned up other evidence of drug use. Dkt. 77-3 at BCI.4.0183.

## III.    The substandard medical clearance[8]

Slater took Lacey to Presentation Medical Center ("PMC") to be medically cleared for jail. Ex. 17, PMC Records. Due to Lacey's condition, the responding paramedic had radioed and asked

---

[8]    Likely recognizing the abundant disputed factual issues in this case, Defendants Roy Cordy, MD, and Presentation Medical Center chose not to move for summary judgment.

the on-duty physician, Dr. Roy Cordy, whether to give Lacey a sedative, but he told them not to sedate her. Ex. 18, D. Welander 9, 19. At the hospital, Lacey claimed she had left her six-month-old son, ███ in the trees. Dkt. 77-4, Slater Report at BCI.4.0186. Slater contacted Lacey's grandmother, who confirmed ███ was safe with Lacey's mother. *Id.* Hospital records indicate that Lacey kept "talking to herself" and was "high on meth/drug use." Ex. 17 at Higdem-0072. Slater testified about Lacey's hallucinations and delusions at the hospital, including that she believed a speaker in the wall was a camera and that he and the medical staff were trying to "gas her out" due to wearing face masks for COVID-19. Dkt. 77-7, Slater 107-08.

Lacey presented with high blood pressure and a tachycardic heart rate of 140. Ex. 17 at Higdem-0065. Her lab results indicated abnormalities, including a highly elevated white blood cell count, and her drug screen came back positive for amphetamines, methamphetamines, and cannabinoids. *Id.* at Higdem-0066-68. Dr. Cordy diagnosed her with meth intoxication and a urinary tract infection. Dkt. 77-9, Cordy 53-56. He did not include meth intoxication on his discharge instructions, an error he agrees breached the standard of care. *Id.* at 123, 127-28; Dkt. 87-4, Discharge Instructions. Lacey only spent an hour and forty minutes at PMC. Ex. 17 at Higdem-0084.[9] After Lacey was discharged around 3:15 pm, Slater drove her to the Jail. *Id.* at Higdem-0064. She was charged with disorderly conduct and preventing arrest, both misdemeanors. Dkt. 77-6, Citations.

## II.    Lacey's In-Custody Death at the Jail

Upon arriving at the Jail around 3:30 pm, Slater handed Lacey off to CO Dixie Gladue for booking. Dkt. 77-21, Pre-Booking Video. Gladue's shift ended a few hours later, and Defendants

---

[9]    There are several factual disputes related to Dr. Cordy's actions and discharge instructions that, while material to Plaintiff's negligence claims, are not material to the deliberate-indifference claims at issue here.

Azure and Brunelle took over. Lacey would be dead around nine hours after admission.

### A.  Hallucinations from start to finish

Everyone agrees Lacey was hallucinating throughout the booking process, although the County Defendants' correctional expert, Jeff Eiser, boldly speculated that Lacey could have been faking. *Compare* Ex. 19, Boe 114-18; Dkt. 77-20, Leingang 66; Anderson 106; Ex. 20-A, Gladue BCI Interview; Ex. 21, Julius 169-73 *with* Ex. 22, Eiser 50-54. In her booking phone call, and the last time she spoke to her mother, Lacey hallucinated that her mom was at the Jail with her. Dkt. 77-14, Booking Call.

Jail policy required staff to perform a medical screening on all inmates at intake. Ex. 3, at RC0058. COs were to determine whether an inmate was in "an appropriate frame of mind to be processed for admission," and had to ensure an inmate was not showing "inappropriate behavior" such as "having visions or hallucinations."  *Id.* at RC0060. But Gladue was unable to finish the booking process and did not complete the required medical screening because Lacey wasn't able to answer the questions and was "too focused on talking to whoever wasn't there."  Ex. 20-B; *see also* Gladue 40-42. Office Deputy and former Jail Administrator Kim Nadeau approved not doing the medical screening. Gladue 95-96.

### B.  "Constant" observation of Lacey

Due to Lacey's condition, Gladue put her, alone, in the upstairs cell of the female housing unit, so that COs could "keep a better eye" on her. Gladue 68. Lacey was on "lockdown," meaning she was locked into the cell by herself, and COs could keep constant observation through video monitoring in the Jail's control room. Brunelle 128; Gladue 98-101. There were five other inmates in Lacey's housing unit. Their cells were below Lacey's, and they were free to roam around the housing unit, including upstairs. Ex. 23, Probable Cause Affidavit, at 2. The video footage shows

the other inmates frequently congregated outside Lacey's cell, often trying to communicate with her. *E.g.*, Ex. 24-A; Ex. 25-A. They went up to check on Lacey more than the COs did. Anderson 123. At the 6 pm shift change, Gladue instructed the oncoming COs, Azure and Brunelle, to keep an "extra eye" on Lacey and try to complete the medical screening. Gladue 68, 74-75.

### C.  "15-minute watch, fuck that shit"

While state law mandated a minimum of hourly checks on all inmates, it required COs to put "special needs" inmates under "close staff supervision" and log the "time, condition, and actions of the inmate." Ex. 2 at 11. To comply with state law, the Jail required COs to conduct 15-minute checks on special-needs inmates and report observations on a special form. Ex. 3, at RC 0055; Ex. 26, Special Needs Log. Because she was intoxicated, Lacey was a special-needs inmate and should have been placed on 15-minute watch. Anderson 111-13; Zachmeier 61.

Gladue and Brock Charette were the COs on duty when Lacey came to the Jail. Brock Charette testified he did not remember if Lacey was on special watch, and Gladue testified she did not put Lacey on special watch because Lacey was just talking to herself, which wasn't unusual in the Jail. B. Charette 59; Gladue 21. Brunelle, Azure, and Duane "Troll" Charette came on duty at 6 pm for the night shift, with Azure and Brunelle assigned to CO duties at the Jail, and Duane Charette assigned to police dispatch. Brunelle 25; D. Charette 143. Azure testified that she asked the day shift why Lacey was not on special watch but did not remember what they said. Azure 49-51. Brunelle, for his part, testified that Lacey was not on 15-minute watch, and he never thought about putting her on it. Brunelle 122.

All four COs testified in their depositions that they did not know whether Lacey was on drugs. B. Charette 102-03; Gladue 21; Brunelle 105, 143; Azure 30. The inadvertently discovered

audio from the control room blows a hole in this testimony.[10]    At the 6 pm shift change, conversations among the COs highlight that everyone knew Lacey was high—"crazy high" and "high as a kite"—but they all conspired to pretend she was "not on drugs" and was "not high." Exs. 32-A, 32-B, 32-C. Why? So that they did not have to put her on 15-minute special watch. Ex. 32-D. ("Do *you* want to do a special watch?" "Oh, yeah, yeah . . . she is not high."). At one point, Azure actually says, "I know, I got it . . . shh! Don't say it!" after it is repeated, with a wink, that Lacey is "not on drugs." Ex. 32-C. Azure then adds, "**15-minute watch, no, fuck that shit.**" *Id.* To reiterate: the COs *consciously decided* not to put Lacey on a 15-minute watch because they didn't want to have to actually watch her. The COs also made fun of Lacey's condition throughout the video. For instance, because Lacey hallucinated about her mother, the COs joked that all Lacey had with her in the cell were "a tray, bed, blanket, cup . . . and her mom." Ex. 32-E.

### D.  Lacey deteriorates—"████████████"

Lacey's behavior changed over the course of her nine hours at the Jail. Although she hallucinated the entire time she was there, she also started exhibiting other concerning symptoms. Around 4 pm, Lacey reached for and stared at the ceiling and bathroom lights, occasionally jumping at them or hanging on the bathroom door. Ex. 23 at 6-7; Ex. 70-A. Around 6 pm, she started running around her cell, looking over her back, as if someone were chasing her. Ex. 23 at 6-8; Ex. 68-A. She also started kicking at things and appeared to try to get out of her cell. Ex. 68-

---

[10]    The Jail produced video from the control and dispatch rooms in December 2023. In December 2024, after the County Defendants filed their motion, Plaintiff's counsel's IT department converted these videos to an easier format for viewing because they were grainy and laggy. *See* Exs. 27-49. In doing so, Plaintiff discovered the video files have had corresponding audio the entire time, a fact previously unknown to Plaintiff, and presumably the other parties. The audio eviscerates the County's contrived litigation positions—including that no one knew Lacey was high—and exposes the extent to which County employees at all levels have lied in this litigation.

B. Lacey can be seen repeatedly hitting, banging, and running into the door. *Id.* Around 7 pm, her balance deteriorated, with her visibly swaying and rocking back and forth. Ex. 23 at 9; Exs. 49-A, 49-B. She also started to scratch at the floor. Ex. 23 at 11; Ex. 49-C.[11]

The other inmates, who got the closest to Lacey during this period, were alarmed enough by her condition to repeatedly press the emergency intercom button to call the attention of Azure and Brunelle. Ex. 23 at 17-20; Ex. 50-A, Azure BCI Interview; Ex. 51-A, Mayer BCI Interview.[12] Around 6 pm, for instance, an inmate pushed the intercom and asked the COs to turn on the lights in Lacey's cell so she would calm down. Ex. 32-F. Lacey's screams and cries can be heard reverberating through the sound system at this time. *Id.* The COs turned on the lights at 6:18 pm, but not before Brunelle sneered to Azure, "I don't think it's gonna matter whether the light's on or off for that fucking dumb bitch." *Id.* Later, an inmate pressed the emergency button and asked

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

---

[11] Most of the experts agreed Lacey deteriorated *significantly*. Anderson 118 ("significant decline"); Zachmeier 89 ("Common sense tells you her condition's deteriorating"); Julius 165-69, 292 ("precipitous downtown" around 6 pm and a "distinct change"); Boe 184 (changes were so dramatic that anyone paying attention to her would say she was in trouble). While the County's experts did not agree there was a significant change, even they agreed there was *some* change. *See* Eiser 39 (Lacey urinating on herself was "significant" but there was no "significant change"); Leingang 277 (Lacey didn't decline but there was a "notable change"). Lacey's death in her cell, standing alone, highlights the dramatic downtown in her condition while jailed.

[12] Lacey herself also pressed the emergency intercom button. Ex. 50-B. Azure apparently assessed it was never an emergency—but without ever talking to Lacey. Azure 172-73.

### E.  Lacey cannot get dressed—even with help

Around 8:30 pm, Lacey lost further motor control and coordination. She exited the bathroom with her pants and underwear off, having urinated on herself, and threw her soiled underwear on the ground. Ex. 23 at 10; Ex. 69-A. The inmates pressed the emergency intercom button to alert the COs, asking for a towel and pads.[13] Ex. 23 at 17. At 9:17 pm, *more than forty-five minutes after Lacey removed her underwear*, Azure finally came up to Lacey's cell. *Id.* at 11. The video of this encounter is hard to watch. It shows Azure trying to get clean underwear on Lacey for a painstaking seven minutes. Ex. 69-B. When Azure enters, Lacey appears unaware that Azure is physically in the same room. Ex. 69-C. During this seven-minute exchange, Lacey is unsteady on her feet—swaying, falling, and needing assistance to stand. Ex. 69-D. Lacey appears to hit her head on the wall and the metal bunk beds. Ex. 69-E. At one point, Azure has to physically pull Lacey up from a sitting position, like one would do with a child. Ex. 69-F.

 

Due to the way Lacey was acting, Azure asked her what she was on, and Lacey told her

---

[13]    When this happened, Brunelle ███████████████████████████
████████████████████████████████████████████

"ludes," which Azure knew to be drugs. Azure 24, 29, 183-84. After getting Lacey into clean underwear, Azure gave up trying to get Lacey into pants and left the cell. Ex. 69-G; Ex. 23 at 12.

After this encounter, Azure was concerned enough to suggest to Brunelle that they take Lacey back to the hospital for further evaluation. According to Azure, Brunelle told her he contacted Nadeau, who told him that they should not take Lacey back to the hospital because she had been medically cleared:

> Q: So after you left Lacey's room, you said you went back downstairs and talked to Myles?
> **A: Yes.**
> Q: And you said at that point in time, that you felt like she should go to the hospital; right?
> **A: I said, "Should we get her" –yes–**
> Q: And –
> **A: –be seen again.**
> Q: Again, just so I understand, Myles, then, as the supervisor, would have the ultimate choice as to whether that would happen?
> **A: I don't know—I don't recall, like, what the whole chain of command is there, but all I know is he—he said that he had talked—some way communicated with Kim [Nadeau], and Kim said, "no. She's already been medically cleared." That is what I was told.**

Azure 211-12; *see also* Azure 25-27, 33, 115-116.[14] The Sheriff confirmed that any CO could call an ambulance and did not need supervisory approval. Dkt. 77-18, Gustafson 70-72. Lacey was bad enough at this point for Azure and Brunelle to agree that she needed to be watched closely. Azure told Brunelle they needed to watch Lacey closely because she "had everyone beat" in terms of demolishing her body and being on those "good drugs." Ex. 38-J. Brunelle agreed and said they'd

---

[14]      It is genuinely disputed whether Brunelle actually contacted Nadeau to ask about taking Lacey back to the hospital. *Compare* Azure 25, 33, 212 (Brunelle told Azure he talked to Nadeau, who said not to send Lacey back to the hospital), *with* Brunelle 123 (doesn't believe he reached out to Kim); Nadeau 43-44 (doesn't recall Myles contacting her, her phone doesn't have service at her home, and she would have told the COs to contact the Sheriff); *see also* Eiser 31 (the conflict between Azure's and Brunelle's testimony must be decided by a jury). ████████

keep the "camera on her for the rest of the night." *Id.*

### F. On-the-clock affair

Azure and Brunelle were having an affair—and it took precedent over Lacey. The affair was inappropriate for a number of reasons, including that Brunelle was Azure's supervisor, they worked together, and most importantly, they engaged in sexual contact while on the clock—distracting from their job duties, at least some of which, evidenced by this case, concerned matters of life or death. *See* Anderson 126 (agreeing that when COs are having sexual contact, they are necessarily not watching inmates). Control room footage from the night Lacey died shows them stealing away for a kiss or other inappropriate contact when Duane Charette was not looking. Exs. 38-A, 38-B, 38-C, 40-A. One of these dalliances occurred just **ten minutes** after Azure returned from the failed clothing change, revealing the COs' disgusting priorities that shift. *See* Ex. 38-D (whole clip); *see also* 38-E (discussing the clothes change); Ex. 38-B (kissing).

 

Ex. 38 at 22:18 and 22:53. Brunelle testified there was ███████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████—a shameless lie blatantly contradicted by

the video evidence showing him with his hands up her shirt and kissing her on the lips. ███ ███ Ex. 38-F. To her credit, Azure was more candid in her deposition, admitting that ███ ████████████████████████████████████████████████████████████ ██████ .

**G.** ████████████████████████████████

Throughout the day and night shift, the COs did not conduct 15-minute checks on Lacey, nor did they complete even the state-mandated minimum of *hourly* checks on her and the other inmates. Dkt. 77-16, Jail Logs; *see also* Brunelle 134-37, Azure 128-29 (admitting hourly checks were not completed).[15] When Brunelle *did* perform cell checks on Lacey, most were from the bottom of the stairs. Brunelle 71-72; Anderson 108 (cell check from bottom of stairs was not a valid cell check); Zachmeier 39-40 (from the bottom of the staircase, you couldn't see an inmate in the upstairs cell "unless they're standing at the window waving at you"). That is, Brunelle didn't care enough to climb the stairs and get a good look at the inmate on "lockdown" who was actively hallucinating and had urinated on herself.

Gallingly, the COs did not perform a cell check on Lacey for nearly **three hours** after the failed clothes change, despite Lacey being in such poor condition that Azure suggested taking her back to the hospital. Ex. 23 at 12-13. Why weren't the cell checks being completed? Because lovers Azure and Brunelle were too busy watching a movie in the control room. The footage shows them watching a horror movie instead of checking on the inmates under their watch. *E.g.*, Exs. ███

---

[15]    The number of checks the COs actually completed is unknown. Both investigators concluded the Jail's logs were inaccurate. Zachmeier 62, 91-92, 96; Anderson 111 (the Jail's logs were inaccurate in "several material respects" including that "some logged events were not actually completed"). The Jail's logs were also fabricated and/or inaccurate in the Wilkie in-custody death, showing a pattern of behavior. Zachmeier 21. Regardless, the number of cell checks that *are* recorded violate state law, even if the logs could be trusted.

█, 40-B. Crucially, even the County Defendants' *own experts* agree that this egregious gap in observation after the clothes change was a serious failure. Eiser 168; Leingang 65.

After midnight, Brunelle finally decided to conduct a cell check. Dkt. 77-16 at RC0029;

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████. In his BCI interview, Brunelle claimed he "freaked out." Ex. 52-A. ██████

██████████████████████████████████████████████████████████

████████████████████. Instead of starting CPR, he went back to the dispatch and control area—having to get buzzed through *four* doors first—to get the other employees. D. Charette 69; Brunelle 106-111. Unbelievably, Brunelle called *the Sheriff* before he called an ambulance, ████████████

██████████████████████████████████████████████████████████

████████████████████; Ex. 55, Jail Mortality Review, at DOCR-003906.

████████████████████████████████████████████████████

██████████████████████████████████████████████████. EMS workers arrived at the Jail at 12:27 am. Dkt. 87-6, EMS Report, at ALLEN_000026. After attempting various measures, they called PMC, and Dr. Cordy pronounced Lacey dead at 12:42 am. *Id.* at ALLEN_000025. The EMS report states █████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

The autopsy lists her cause of death as █████████████████████████.

### III.    After Lacey's Death

#### A.    The Sheriff gets his hands dirty – "don't fucking talk to him"

After Lacey's death, the Sheriff came to the Jail on a mission, though not an honorable

one. Consistent with the prevailing culture, he immediately began obstructing the process. ▮▮▮



▮▮▮. The Sheriff's actions in the days and weeks after Lacey's death echoed this ethos. He issued a public statement blaming the "overwhelming drug problem" for Lacey's death, rather than his Jail's manifest failures or COs' on-duty romantic distractions. Ex. 54, Sheriff's Statement. He also conducted a so-called "mortality review," concluding the COs in "good faith" attempted to resuscitate Lacey, and he never disciplined the COs for their failings that night. Ex. 55 at DOCR-003906; Brunelle 32-34; Azure 14-20. And while he eventually asked Azure and Brunelle to resign, he made it clear it was only because of ▮▮▮

▮▮▮.

### B. The shutdown and failed attempts to reopen

Zachmeier conducted a criminal investigation into Lacey's death, while Anderson simultaneously conducted an administrative investigation. The culture of dishonesty that Anderson noted back in 2019 was still alive and well. Comparing the Jail's logs to the video proved the logs were so inaccurate "in several material aspects" that Anderson moved to shut down the Jail. Anderson 111-12. On June 18, 2020, the DOCR issued an order immediately closing the Jail—the most drastic measure the DOCR can take. Ex. 56, Closure Order; Anderson 49. By that point, it

had already determined the Jail violated standards regarding medical screening of inmates, inmate observation, and intoxication management. Ex. 56 at DOCR-001007-001008. The nature and extent of the noncompliance, in the DOCR's eyes, presented a "danger and justifie[d] a temporary closure without issuance of a prior order of noncompliance." *Id.*

After less than a month, the Sheriff asked to reopen. The DOCR denied the request, explaining that the Jail's violations were not "limited and minor," and in fact, the "extent of noncompliance" presented an "ongoing danger to the health and safety of inmates." Ex. 57, Denial of Reopen Request. In September, the DOCR finally allowed the Jail to reopen, but only as a "Grade Three" facility, meaning that it could hold inmates for no more than ninety-six hours. Ex. 58, Grade Three Order, at DOCR-000620. By then, the DOCR concluded that the Jail had actually violated five of the Correctional Facility Standards in connection with Lacey's death:

- Standard 21 relating to medical screening, by not completing a medical screening of Lacey;

- Standard 32 relating to inmate observation, by not completing 15-minute or even hourly checks on her;

- Standard 33 relating to daily written records, because the Jail's logs were inaccurate and "some logged events were not actually completed";

- Standard 52 relating to health-care training, because Jail staff were not able to identify Lacey was having a medical emergency or respond to it with immediate CPR; and

- Standard 59 relating to intoxication management, because the COs did not put Lacey on special watch.

*Id.* at DOCR-000618-619. Despite the Jail only having authority to hold inmates for four days at a time, the DOCR discovered the Jail was circumventing this mandate by holding inmates for four days, transferring them out for a day, and then bringing them back for another four. Anderson 139-41. The DOCR viewed this as another way the Jail was evading oversight rather than actually changing. *Id.* Money was the object. *Id.* at 131-37; Gustafson 205-206; Zachmeier 101-03.

Meanwhile, the BCI's investigation culminated in the State bringing criminal charges against Azure and Brunelle. Each was charged with being a "public servant who knowingly refuses to perform any duty imposed upon him by law," in violation of North Dakota Century Code § 12.1-11-06. In his probable cause affidavit, Zachmeier stated there was also probable cause for a felony relating to tampering with public records. Ex. 23 at 26. He testified that Lacey's death was the first time in his decades of experience that he had seen criminal charges brought against COs. Although cases against public officials are "very, very hard" to bring, he testified that criminal charges in this case were warranted by Azure's and Brunelle's egregious conduct:

> [W]atching the video, I was offended because all it would have been was one phone call to stop the whole sequence. And they decided not to do that by choice and then lied about it after the fact.

Zachmeier 29-30. Azure and Brunelle each entered an "*Alford* Plea of Guilty" to knowingly refusing to perform their duties. Ex. 59, Brunelle Plea; Ex. 60, Azure Plea.

Plaintiff Jessica Allen, Lacey's mother, commenced this federal civil-rights action in May of 2022. She brought claims individually and on behalf of Lacey's heirs under 42 U.S.C. § 1983 against Rolette County, Azure, and Brunelle for their deliberate indifference toward Lacey's serious medical needs at the Jail, as well as state-law negligence claims against Dr. Cordy and PMC. Dkt. 10. Despite the extensive evidence recited above, the County now moves for summary judgment. Judging by its counsel's summary-judgment memorandum, the County *still* endorses every bit of Azure's and Brunelle's malfeasance.

## **LEGAL STANDARD**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and any reasonable inferences drawn from the

evidence in the light most favorable to the nonmoving party. *Ackerman v. U-Park, Inc.*, 951 F.3d 929, 932 (8th Cir. 2020). Although the County Defendants *cite* the correct standard, they ask the Court to *apply* a completely different one.

## ARGUMENT

Count One of the Amended Complaint alleges that Azure and Brunelle violated the Constitution by being deliberately indifferent to Lacey's serious medical needs. Count Two alleges deliberate indifference on the part of Rolette County through its custom of failing to provide for the safety and wellbeing of inmates with respect to inmate observation and intoxication management. Ample evidence exists in the record to create genuine issues of material fact as to both claims, and the County Defendants' motion should be denied.

### I.    Deliberate Indifference Claims Against Azure and Brunelle

Lacey was a pretrial detainee during her time at the Jail. Thus, her deliberate-indifference claim is based on the Due Process Clause of the Fourteenth Amendment, which borrows from Eighth Amendment analysis. *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017). Deliberate indifference has an objective and a subjective component. To satisfy the objective component, Plaintiff must show Lacey suffered from an "objectively serious medical need." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) ("*Barton I*"). A medical need is objectively serious if it is "supported by medical evidence, like a physician's diagnosis," or if it is "obvious to a layperson." *Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006) (quotation omitted). Establishing the subjective component of deliberate indifference requires showing Azure and Brunelle had actual knowledge of Lacey's serious medical need and then deliberately disregarded it. *See Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) ("*Barton II*"). Circumstantial evidence may be used to prove a defendant's actual knowledge, including "the very fact that the medical need was

obvious." *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013) (brackets and quotation omitted). Whether an inmate's condition amounts to a serious medical need, whether an official actually knew of the inmate's medical need, and whether that official deliberately disregarded the need are all questions of fact. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011).

### A.  Lacey was suffering from an objectively serious medical need

In moving for summary judgment, the County Defendants don't appear to contest that Lacey suffered from an objectively serious medical need. Nor could they—after all, she died at the Jail. Even so, her medical needs were objectively serious under either formulation of the test. Dr. Cordy diagnosed her with meth intoxication, and medical evidence in the record, such as her elevated heart rate, positive drug screen, and continued hallucinations supports such a diagnosis. *See generally* Ex. 17. Lacey also exhibited symptoms of severe intoxication that were obvious to a layperson, evidenced by multiple people—the other inmates in her housing unit—telling the COs that she should be taken back to the hospital. Ex. 61, Brianna Mayer Statement; *see also* Ex. 62-A, Myers BCI Interview; Azure 27-28. In *Thompson*, the Eighth Circuit found the plaintiff had an objectively serious medical need where another inmate warned the defendant CO the plaintiff needed help and "anyone witnessing [the plaintiff's] condition at the jail would have recognized he needed medical attention." 730 F.3d at 749. So too here.

To be sure, not every inmate under the influence of drugs or alcohol suffers from an objectively serious medical need. An individual analysis of the totality of the circumstances is required, and, at this stage, in the light most favorable to the plaintiff. *See Barton I*, 820 F.3d at 965 (noting that although "most individuals arrested on intoxication-related charges are not in obvious need of prompt medical care," an inmate who has trouble walking or sitting up and who

cannot answer questions is in obvious need of medical attention).

There is no "jail" carveout for what amounts to an objectively serious medical need. Testimony from the COs revealed a dismissive and jaded sense of what is considered "normal" in the Jail. Gladue 18; Azure 100-01; Brunelle 160-61. Illustrating as much, Azure testified that Lacey's behavior during the failed clothes change was common in the Jail and not necessarily concerning, but she also testified that if she saw someone at a public library act like Lacey did, she would probably call the police. Azure 100-04, 245-47. But if "a plumber or bus driver or dishwasher" were to see the injured party and tell her, "You really need to see a doctor," then the plaintiff has shown an objectively serious medical need—that is what makes the test *objective*. *Trujillo v. Corizon Health, Inc.*, No. 17-CV-1633, 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019). Lacey's condition undoubtedly amounted to a serious medical need and was obvious to everyone around her, regardless of whether she was at a public library, on a bus, or in a jail.

### B. Azure and Brunelle cannot hide their knowledge

Azure and Brunelle unmistakenly knew Lacey was suffering from an objectively serious medical need. The County Defendants' focus on whether Azure and Brunelle were *informed* Lacey was intoxicated on methamphetamine is a red herring. Dkt. 78-2 at 33. Defendants do not need to know the underlying cause of a serious medical condition to know that an inmate is suffering from one. *See Barton I*, 820 F.3d at 965; *Trujillo*, 2019 WL 1409331, at *3 n.4. The question is not whether the COs knew Lacey was on drugs. They knew that—and lied about it. The audio from the control room makes this abundantly clear. *See* Exs. 32-B and 32-C (discussing Lacey being "crazy high" but also "not high"—*wink wink*). Because not every intoxicated inmate needs prompt medical attention, *Barton I*, 820 F.3d at 965, the proper inquiry is not whether Azure and Brunelle knew Lacey *was high* or had been *informed* she was on methamphetamine, but rather whether they

knew she *was suffering from an objectively serious medical need*—and they did.

Lacey experienced a marked decline at the Jail, and the signs of deterioration were obvious to both the COs and the other inmates. *See Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (officers' subjective knowledge can be inferred from the obviousness of the medical need). The most obvious sign was the onset of incontinence and Lacey's inability to put on her own pants and underwear. Azure saw this up close when Brunelle sent her to get Lacey changed into clean clothes. Azure 23-30, 102; Brunelle 101-02; ████████████████████████████

████████████████████████. The video shows Azure trying to get clean underwear on Lacey for an excruciating seven minutes. Ex. 69-B. During this seven-minute exchange, Lacey exhibited signs of someone who needed prompt medical attention: swaying, falling, being unable to stand on her own, and hitting her head on the wall. Ex. 69-D. Upon returning to the control room, Azure reported that Lacey was bleeding, "scratching the shit out of herself," and ripping at her hair—all signs that an inmate is not well and needs medical attention. Ex. 38-G. Azure explained that she was only able to get Lacey's underwear on, and not her pants, because Lacey "kept hitting her head on the wall." Ex. 38-H. It does not take a medical degree to know that an intoxicated inmate who hits her head multiple times should be evaluated by a medical professional. *Barton I*, 820 F.3d at 965; *Thompson*, 730 F.3d at 749.

Azure was the one person in the Jail who got closest to Lacey when she was in that rough of shape, physically touching her, helping her stand up, attempting to converse with her, changing her out of soiled underwear, and deciding to give up on getting her into pants. Azure, out of anyone, had the best information about how poorly Lacey was doing. And, after this encounter, she was concerned enough to suggest to Brunelle that they take Lacey back to the hospital for further evaluation, undeniably exhibiting a subjective awareness of Lacey's serious medical need. Azure

25-27, 33, 115-116, 211-12. This conversation makes clear both Azure and Brunelle were subjectively aware of Lacey's dangerous condition.

The COs' subjective knowledge is also confirmed by what the other inmates told them, which Azure and Brunelle deliberately chose to ignore. Inmate Brianna Mayer told the COs that something was wrong with Lacey and reported that Lacey's hands and feet were turning blue. Ex. 51-A. She also told Azure and Brunelle that Lacey was choking and biting herself. *Id.* The COs dismissed her concerns. Ex. 61. Inmate Joanna LaVallie told both Azure and Brunelle that there was something wrong with Lacey, and she shouldn't be in the Jail. Ex. 63, LaVallie Interview Report, at BCI.4.0159. She pressed the emergency intercom button to tell them that Lacey's toes and nails were turning purple. *Id.* They said they were coming to check but never did. *Id.* Lacey was acting in such a bizarre and frightening manner that the other inmates believed she was *possessed by a demonic spirit*. *Id.*; Ex. 51-B. The County Defendants can't throw a blanket over all inmates as "high" or "crazy" when the other inmates were all singling out Lacey as needing help. Inmate Stephanie Myers explained shortly after Lacey's death that she had seen a lot of people on drugs but had "never seen anybody act like that." Ex. 62-B.

The idea that Azure and Brunelle did not know something was seriously wrong with Lacey is wishful fiction on the County's part, blatantly contradicted by the video and audio recordings from that shift. And the State's decision to criminally charge Azure and Brunelle with being a "public servant who *knowingly* refuses to perform any duty imposed upon him by law"—an offense containing subjective knowledge as an element—and their *Alford* pleas to that charge provide further evidence of their deliberate indifference. N.D.C.C. § 12.1-11-06 (emphasis added). Tellingly, the "undisputed evidence" the County Defendants point to when asserting that Azure and Brunelle did not draw the inference that Lacey was at risk of serious harm is the COs' own

self-serving testimony denying knowledge of any risk. "A plaintiff, however, need not secure an official's admission that he or she knew of the risk" to establish deliberate indifference, as that would be "nearly impossible to secure." *Nadeau v. Shipman*, 471 F. Supp. 3d 952, 970 (D.N.D. 2020). That is particularly true for defendants who are willing to lie under oath. *See, e.g.*, Brunelle 282-83 (admitting he lied about not knowing how to take an inmate's vitals because he was "frustrated" by counsel's questioning).[16]

### C.  Azure and Brunelle were deliberately indifferent to Lacey's medical needs

In the face of their knowledge of Lacey's serious and deteriorating condition, Azure and Brunelle did nothing to help her. That is not Plaintiff's take on the facts—Brunelle said it himself. When asked in his deposition what he did to help Lacey that evening, Brunelle could not think of a single thing. Brunelle 293-94. He admitted that he did not talk to Lacey the entire shift despite being the CO assigned to the floor. *Id.* at 11, 85. He never sought any information from her. *Id.* at 85. He could not say if it ever even occurred to him to ask Lacey if she was okay. *Id.*

Azure only spoke to Lacey one time, and it was during the failed clothes change. The County Defendants assert that Azure could not have been deliberately indifferent because her actions show she tried to make Lacey more *comfortable*. Dkt. 78-2 at 34. This assertion misunderstands the standard for responding to a serious medical need and is tantamount to saying

---

[16]    The County Defendants rely on their experts to suggest it was reasonable for Azure and Brunelle to conclude that Lacey did not exhibit signs of a serious medical need until she was found not breathing. Dkt. 78-2 at 34-35. That testimony goes to ultimate legal issues, on which experts are not permitted to opine. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). It also conflicts with other experts' testimony, creating a disputed fact. *E.g.*, Julius 233-37 (there were obvious "signs Lacey was deteriorating" on the footage the COs were watching). The County's hired guns are the only ones who can tell the story the County wants, but not even they could stay in character in this case. *E.g.*, Leingang 10-13, 25-28, 40 (personally saddened by the COs' failures but was told to lay off opinions about the Jail). Plaintiff did not hire any experts to oppose the Defendants' experts—rather, Plaintiff disclosed Anderson and Zachmeier, who completed hands-on investigations under North Dakota state authority.

a jail guard was not deliberately indifferent to an inmate with a broken neck because she gave him a pillow to sleep on. Regardless, this assertion, unsupported by factual citation, cannot be taken seriously after the control-room audio revealed Azure's "15-minute watch, no, fuck that shit" comment, among others. The thread of inaction runs from the COs' first discussion of Lacey. Taking "no steps" to secure medical attention when a CO has direct knowledge of an intoxicated inmate's "obvious need" for such care amounts to deliberate indifference. *Barton I*, 820 F.3d at 965. It bears repeating that even the County Defendants' own expert couldn't defend their conduct. Dr. Leingang admitted that outside of changing Lacey's underwear, Azure or Brunelle did not do *anything* to help her. Leingang 75. He opined that had the jail staff done their jobs, Lacey could have been saved, and their failure to do so was "inexcusable." *Id.* at 25-26; Ex. 64, Leingang Report, at 7.

Appallingly, the COs did not check on Lacey for nearly *three hours* after the clothes change—until Brunelle found her not breathing after midnight—because they were too busy Netflix and Chilling instead. While Lacey was screaming and banging on her cell door—later moaning and groaning—and the inmates were pressing the emergency button, Azure and Brunelle were engrossed in a movie, and each other. Azure's comments in the control room reveal that she opted to pretend Lacey was not intoxicated so the COs did not have to do as many checks. Ex. 32-C. These comments epitomize both "deliberate" and "indifference." *See Ryan*, 850 F.3d at 426 (concluding a reasonable jury could find COs violated an inmate's constitutional rights when they allowed him to "scream, howl, and bang against his cell door" *for multiple hours* without seeking

medical intervention).[17]

The dismissive way Azure and Brunelle ignored the inmates' attempts to raise the alarm about Lacey is yet another way they exhibited deliberate indifference to Lacey's serious medical needs. *See* Brunelle 278 (telling the inmates "Yep. Yep . . . I'll look into it" and then going about his business); Azure 27-28 (describing taking inmate reports with a grain of salt). The audio from the control room confirms their indifference. Ex. 32-F (Brunelle commenting that it's not "gonna matter whether the light's on or off for that fucking dumb bitch" after the inmates asked them to turn on the lights in Lacey's cell); ███████████████████████████████████████████ ████████████████████████████. With that mindset, Lacey didn't stand a chance. The County Defendants remind the Court that the standard for deliberate indifference is worse than negligence—here it is, by far.

Even at the very end, Brunelle's abject failure to start CPR and attempt to perform any lifesaving efforts on Lacey amounts to deliberate indifference in and of itself—the cherry on top of a deliberate-indifference sundae. "An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference." *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (citing *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001)). Everyone, even the County Defendants and their own expert, Dr. Leingang, agree that Brunelle's failure to perform lifesaving measures on Lacey was deplorable. *See* Dkt. 78-2 at 34; Leingang 43-45 (the attempted resuscitation was "sadly incompetent" and "after two

---

[17]    The COs' obviously inadequate response to Lacey in this case can also be contrasted with the behavior of the COs in a deliberate-indifference case recently decided by this Court. Although the summary judgment order in *Laducer v. County of Cass* did not involve claims against COs, this Court noted that they completed 30-minute checks on the alcohol-intoxicated inmate, frequently talked to him, and asked him several times throughout the shift if he was okay—all things Azure and Brunelle failed to do here. *See* Order at 4, Dkt. 159, No. 22-cv-208 (D.N.D. Oct. 21, 2024).

minutes have elapsed, it's just too late. No amount of CPR . . . is going to bring them back."); *see also* Zachmeier 110, 145-46 (describing Brunelle as "bebopping" because he was offended by Brunelle not acting in any hurry after discovering Lacey not breathing). █████████████

████████████████████████████████████████████████████████

████. The Sheriff could not fix the Jail's longstanding problems because he had the staff trained to dodge accountability. The actions—and inactions—of Azure and Brunelle failed 19-year-old Lacey at every turn and displayed a stunning amount of deliberate indifference.

### D.  The COs are not entitled to qualified immunity

The County Defendants try to fall back on qualified immunity, but that doctrine cannot save them from their horrific conduct. Qualified immunity shields officers from § 1983 liability unless the facts show they violated a constitutional or statutory right, and the right was clearly established at the time of the violation. *Barton II*, 908 F.3d at 1123 (quotations omitted). It protects "all but the plainly incompetent."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted). But as the preceding facts show, this *is* a case involving the plainly incompetent. After all, the COs' own expert called them hapless and incompetent. Ex. 64 at 9; Leingang 43. Azure and Brunelle are not entitled to qualified immunity because they violated Lacey's clearly established constitutional rights in a way that every reasonable official in June 2020 would have understood. *See Mullenix*, 577 U.S. at 11-12.

In arguing they are entitled to qualified immunity, the County Defendants claim there is no controlling precedent having a "close correspondence to the particulars of the present case."  Dkt. 78-2 at 36. But, like their recitation of the facts, they continue to ignore anything unfavorable to

their position.[18] For the reasons discussed at length above, Azure and Brunelle violated Lacey's right to be free from deliberately indifferent denials of medical care. This constitutional right has been clearly established since at least 2008, well before Lacey's death. *See Ryan*, 850 F.3d at 427 (holding it was "clearly established by 2008 that a pretrial detainee . . . has a right to be free from deliberately indifferent denials of emergency medical care"); *Barton II*, 908 F.3d at 1125 ("[A] reasonable officer in 2011 would have recognized that failing to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates the arrestee's constitutional rights, all the more so when the surrounding circumstances indicate that a medical emergency exists.").

The Eighth Circuit differentiates between minor symptoms of "mere" intoxication and more dangerous signs of severe intoxication. At one end of the spectrum are *Thompson* and *Barton*. The facts of *Thompson* are eerily similar to the facts of this case. There, an inmate appeared intoxicated on drugs during booking, to the point where the booking officer wrote "Too Intox to Sign" on his booking sheet and did not complete the process. 730 F.3d at 745. After the inmate was put in a cell, another detainee observed his intoxicated condition and informed the CO that the inmate needed help, but the CO ignored the warning. *Id.* Several hours later, the CO found the inmate not breathing and did not perform CPR; the inmate was pronounced dead soon thereafter. *Id.*; Brief of Plaintiff-Appellee, 2013 WL 431656, at *5-6. The Court affirmed the denial of qualified immunity, holding that "a reasonable officer would have known that a constitutional violation" occurred when the CO "did nothing" and deliberately disregarded the inmate's serious

---

[18]     They also ignore the well-established principle that "clearly established" does not require a case with identical facts. *Cheeks v. Belmar*, 80 F.4th 872, 877 (8th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The touchstone is "fair notice." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding the law can be clearly established without cases featuring "fundamentally" or even "materially" similar facts).

medical needs "in the circumstances [the CO] confronted." 730 F.3d at 749-50. Given that the circumstances the CO confronted in *Thompson* are so closely analogous to the circumstances Azure and Brunelle confronted here, the law was clearly established for qualified immunity.

*Barton* is similarly instructive and places Lacey's intoxication on the *Barton/Thompson* end of the spectrum. In that case, like here, an obviously intoxicated inmate was booked into jail around 3 pm. *Barton II*, 908 F.3d at 1122. He had trouble standing and spoke with slurred speech. *Id.* Like with Lacey, the booking officer could not get the inmate to answer several questions and did not complete the required medical screening. *Id.* Like with Lacey, another inmate reported to the CO that the inmate was not doing well, and his condition was not improving. *Id*. at 1123. Again, like Lacey, he was found dead in his cell just after midnight. *Id.* Finding the facts more akin to those in *Thompson* than cases involving minor signs of intoxication, the Eighth Circuit affirmed the denial of qualified immunity. *Id.* at 1125. Given the similarities, the Court need not look further than *Thompson* and *Barton* to deny qualified immunity to Azure and Brunelle.

The County Defendants rely heavily on *Grayson* and *Reece v. Hale*, 58 F.4th 1027 (8th Cir. 2023), cases that stand in stark contrast to the facts here and are on the opposite end of the spectrum. During booking, the inmate in *Grayson* was sitting calmly on a bench and coherently answering questions from the officers. 454 F.3d at 806. He "did not display any signs that he was having hallucinations." *Id.* For the next three hours, COs noted during their hourly cell checks that he was quiet, behaved normally, and was not hallucinating. *Id.* at 807. Around 5 pm, his behavior changed, and the COs put him on 15-minute checks and contacted the Jail Administrator. *Id.* Within the next half hour, the inmate took off his clothes, was screaming, sweating, and covered in blood, and started to engage in self-mutilation. *Id.* at 808. The officers entered the cell, tried to restrain him, and summoned an ambulance. *Id.*

The County Defendants' attempt to liken this case to *Grayson* falls flat, because at issue in *Grayson* was whether the defendants were deliberately indifferent in their *initial decision to book* the inmate into the jail, and not their post-booking monitoring after he deteriorated. *Id*. at 809-810 (affirming grant of qualified immunity due to conduct related to "the decision to accept" the inmate into custody). In fact, the district court **denied** qualified immunity to the COs with respect to their post-intake monitoring and timeliness in summoning medical attention; those claims proceeded to trial and were not part of the appeal. *Id.* at 805.[19]

Nor does *Reece* entitle Azure and Brunelle to qualified immunity. There, the Eighth Circuit relied on *Grayson* to find officers entitled to qualified immunity for the initial decision to book the inmate because he was not acting in any unusual way—unlike Lacey, he was not hallucinating and could answer the CO's questions. 58 F.4th at 1030. Subsequently, the inmate started to deteriorate and died hours later. *Id.* The Court affirmed the grant of qualified immunity to the two officers who were called to help the inmate into a restraint chair and then later into a detox cell. *Id.* at 1032. Because those officers requested medical personnel evaluate the inmate, and the medical personnel continued to monitor the inmate while the officers interacted with him, the Court held it was reasonable for them to rely on the medical team's assessment. *Id.* at 1033-34. Although the Court also granted qualified immunity to the CO who was present for the inmate's entire deterioration, it concluded she was not deliberately indifferent because, unlike other cases, she was not so indifferent that she ignored an obviously unwell inmate for multiple hours. *See id.* at 1033 (citing *Letterman*, 789 F.3d at 864, and *Ryan*, 850 F.3d at 425-26). By contrast, that's exactly what

---

[19]    Further, in its opinion, the Eighth Circuit emphasized that the inmate was not showing signs of hallucinations at the jail, *id.* at 806-09, but here, Lacey continued to hallucinate the entire time she was at the Jail, and everyone knew it, making the cases materially different. *See* Dkt. 77-14; Ex. 56 at DOCR-001004; Gladue 37; Boe 210; Julius 169; Anderson 106.

happened here and precludes qualified immunity to Azure and Brunelle.

Understandably, the County Defendants plead for qualified immunity by turning to caselaw establishing that jail officials without medical expertise may rely on the opinions of medical staff. Dkt. 78-2 at 37-38. The problem for the County Defendants is that the control room audio destroys this contrived litigation position. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ The County Defendants cite no evidence that the medical clearance factored into their lack of action. Each reference to relying on Lacey's medical clearance in the County Defendants' memorandum can be ignored by the Court.

Even if Azure and Brunelle had known about the clearance and relied upon it, the caselaw cited by the County Defendants is inapposite because it involves medical evaluations that occurred at jails contemporaneously to the COs' observation, and within the same universe of information and symptoms—not medical clearance by a doctor at an external hospital hours before an inmate experienced a significant and dangerous downturn at the Jail. *See, e.g.*, *Rusness v. Becker County*, 31 F.4th 606, 610-13, 616 (8th Cir. 2022) (COs entitled to rely on assessment of nurse who evaluated inmate multiple times in the jail during same period COs were monitoring him); *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019) (same where inmate was assessed by intake nurse and then on-duty physician at the jail in similar condition to what COs observed); *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) (same where COs delivered sick request forms to onsite nurse); *cf. McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) (holding COs could *not* rely on nurse's assessment of inmate because they did not tell her the inmate was intoxicated on drugs, so she was

evaluating him with different information). Dr. Cordy's (improper) decision to clear Lacey perhaps gives the Jail's employees some cover—notice that the daytime COs are not named defendants—but it is not a free pass forever, particularly not when Lacey started to exhibit new and obviously serious signs of severe intoxication. Azure and Brunelle knew Lacey was exhibiting signs of an objectively serious need and chose to do nothing in response—violating well-established law of which a reasonable officer would be aware.[20]

## II.    *Monell* Claim Against Rolette County

There is also ample evidence to support Plaintiff's claim against Rolette County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The gravamen of this claim is that the County acted with deliberate indifference to Lacey's serious medical needs through a custom of failing to observe inmates and choosing not to correct documented life-safety issues that threatened the health and safety of inmates in its Jail. The County understood the need for closer observation when dealing with special-needs inmates, such as Lacey, held at the Jail while intoxicated or under the influence, having enacted a policy for that purpose. But this policy was routinely violated, including during Lacey's brief incarceration. Ex. 6 at DOCR-000785-86; Ex. 7, at DOCR-003799; Ex. 58 at DOCR-000615. The *custom* at the Jail was to ignore both the County's own policies, and even the more relaxed state-law observation standards. And the Jail's policymaker, the Sheriff, knew it.[21]

---

[20]    For this reason, *Jones v. Minnesota Department of Corrections*, 512 F.3d 478 (8th Cir. 2008), is also inapposite because the COs there lacked subjective knowledge—they were informed the inmate was faking her symptoms because she acted fine until she was told she was being transported to another facility. *Id.* at 483.

[21]    This is not a case involving constitutionally infirm policies, but rather an appalling and knowing failure on the part of correctional employees to follow the Jail's policies, and an appalling and knowing failure on the part of Jail administration to enforce those policies. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368

Where, as here, a plaintiff advances a *Monell* theory based on an unconstitutional custom, she must prove that (1) a "continuing, widespread, persistent pattern" existed, (2) leaders were deliberately indifferent to or tacitly authorized the pattern after receiving notice of it, and (3) the plaintiff suffered an "injury by acts pursuant to" that custom. *Mitchell v. Kirchmeier*, 28 F.4th 888, 899–900 (8th Cir. 2022) (*quoting Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)). *Monell* liability is intended for situations in which a county is the "moving force" behind constitutional violations, and it requires a "flexible analysis." *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 844 (D. Minn. 2021).

### A. Widespread pattern of failing to observe inmates, especially intoxicated inmates

Rolette County was deliberately indifferent to a widespread, persistent, and continuing pattern of inadequate inmate observation. Dkt. 77-16; Ex. 63 at BCI.4.0160 (before Lacey's death, the COs weren't doing regular cell checks); ████████████████████████ ████████████████████). In addition to infrequent checks, the Jail's COs were not physically entering inmates' cells to check that they were okay. Brunelle explained that he did not like to open the door because inmates "always need something." Brunelle 46-48. As demonstrated by his flippant attitude when asked if doing cell checks from the bottom of the stairs was acceptable, he testified that he had always done them that way *since he started in 2014* and was never corrected. *Id.* at 71-72. The County's own correctional expert agreed that Brunelle embodied a habit of doing cell checks wrong that went uncorrected. Eiser 88.

In *Nadeau v. Shipman*, this Court allowed a *Monell* claim to proceed based on a theory that

---

F.3d 917, 929 (7th Cir. 2004) ("For all intents and purposes, ignoring a policy is the same as having no policy in place in the first place."). It is not enough for the Jail to have constitutional policies on paper if the facts raise genuine questions about whether there was a pattern of disregarding and not enforcing them. *Nadeau*, 471 F. Supp. 3d at 980.

a county "tolerated and promoted a custom of failing to provide for the well-being of [its] inmates." 471 F. Supp. 3d at 978. The plaintiff proffered evidence that COs "failed to consistently follow the requirements for timely jail rounds" and "failed to follow important policies." The particular risk at issue in *Nadeau* was suicide, but its *Monell* analysis applies with equal force to inmates in need of closer observation for other reasons, such as intoxication. *See also Lynas v. Stang*, No. 18-CV-2301, 2020 WL 4816375, at *14 (D. Minn. Aug. 19, 2020) (denying summary judgment on *Monell* claim where jail allowed COs to complete ineffective checks of special-needs inmates from small utility hallway behind the cell which, like the bottom of a staircase, offered limited visibility into the cell). After all, this is why the Jail had such a policy in the first place.

Here, the Jail was on a dangerous path with inmate observation and did nothing to course correct or heed warning signs. Start with the in-custody death of Oscar Wilkie in April 2018. Despite knowing he was intoxicated and had trouble walking, COs conducted hourly, not 15-minute, checks on him.[22] Ex. 4 at BCI.4.009, DOCR 3891; Zachmeier 17-21.The Jail was then found noncompliant in both 2018 and 2019 when, during the DOCR's annual inspections, investigators found that the Jail violated standards related to inmate observation because staff failed to put special-needs inmates on close supervision and log 15-minute checks. Exs. 6, 7; Ex. 8 at DOCR-003174. Not even a death prodded the Jail to change its ways.

The DOCR took the unusual step of conducting an additional onsite visit in December 2019, and though it was appeased by changes promised at that meeting, Lacey's death six months later shows that the dangerous practice of failing to observe special-needs inmates went uncorrected once again. As noted above, the COs deliberately chose not to put Lacey on 15-minute

---

[22] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

watch despite knowing she qualified as a special-needs inmate and state law requiring close observation. *See* Exs. 32-B, 32-C; Ex. 3. The Jail's failure to correct the documented issues posed "an immediate life safety concern" in the State's eyes justifying the drastic measure of immediately shutting down the Jail. Ex. 58 at DOCR-000616. The ongoing noncompliance and repeated violations of DOCR standards were not related to trivial requirements like the water temperature— they related to "life-safety issues." Anderson 30-31, 59, 79.[23]

### B. Jail administration received notice of the custom and let it fester

The County knew about its problems with inmate observation and intoxication management. A Jail's deliberate indifference toward a custom can be evidenced by its "failure to discipline" COs who engaged in the custom or by its failure to "order any precautionary measures" to protect inmates from the custom. *Ware*, 150 F.3d at 883-84. The sheer number of times the Jail was informed of problems with the ways COs were observing inmates yet did nothing to change shows tacit authorization. The Jail had no system for feedback, discipline, or auditing of cell checks, despite its storied history of failing to do them correctly. Brunelle 51-52; Gladue 137-38. "As the number of incidents grows, and a pattern begins to emerge, a finding of tacit authorization or reckless disregard becomes more plausible." *Lenz v. Wade*, 490 F.3d 991, 996 (8th Cir. 2007) (cleaned up).

DOCR inspectors made sure to communicate the findings from the 2018 and 2019 annual inspections to leaders at the Jail who could make the necessary changes. Anderson 130. In 2019, when Gustafson became Sheriff, the Jail was made aware it specifically needed to do better with

---

[23]    Even Lacey's death—the second in a two-year period—could not make the County change its ways. The issues with inmate observation at the Jail continued in 2022 and 2023, with initial findings of noncompliance. Anderson 159-61, 163-65; Exs. 65, 66, 2022 and 2023 Inspections. Anderson agreed it would be fair for someone in Rolette County to read the DOCR's inspections from 2018 to 2023 and think the County didn't learn anything from Lacey's death. Anderson 166.

inmate observation. Anderson 35-38. But after being informed of the ongoing issues with inmate observation and intoxication management, Jail leadership[24] made assurances to the DOCR amounting to nothing but lip service designed to get the DOCR off their backs. Anderson 51-52.

Coming out of the 2019 annual inspection, then-Jail Administrator Nadeau assured the DOCR that the Jail would "refresh staff on special watches" and the Jail Administrator would personally review any new special watches to ensure staff were conducting them correctly. Ex. 10. Despite saying these corrective actions would be implemented by November 2019, they were not done in Lacey's case, and worse, the COs on that shift knowingly conspired *not* to put an obviously intoxicated inmate on special watch. The COs felt so emboldened about their deliberate decision not to put Lacey on special watch that they discussed it—with laughter—while being recorded in the control room. Nadeau was working at the Jail when Lacey was booked and was informed the COs could not complete the medical screening; she knew that Lacey was not on special watch. Nadeau 85; Gladue 95-96. So much for personal review and refreshers.

Even as an outside entity, the DOCR could perceive the troubling culture that permeated the Rolette County Jail. After the 2019 inspection, Anderson had "direct conversations" with Jail leadership about the Jail's culture of doing just enough to get by and evade a shut-down order. Ex. 11. The gist of those direct conversations? "Either you don't know what you're doing or you're just lazy." Gustafson 194. Those conversations offended the Sheriff, but not enough for him to address the serious issues festering at his jail.

Anderson had hoped things would change once the Sheriff took over as Jail Administrator, but Lacey's death revealed the false promise of that hope. Anderson 77-78. The Sheriff's handling

---

[24]    Both Nadeau and the Sheriff are policymakers for purposes of *Monell* liability because they were responsible, at relevant times, for the "operation of the jail and the implementation of [its] policies." *Ware*, 150 F.3d at 885.

of the first crisis at the Jail under his helm reveals glaring signs of the culture of complacency, evasion, and dishonesty that he not only condoned, but also perpetuated. The Sheriff:

- ███████████████████████████████████████████████
  ███████████████████████████████████████████████
  ██████████████

- Wrote a statement blaming drugs rather than the Jail's failures for Lacey's death. Ex. 54.

- Completed a sham mortality review claiming the COs "in good faith" attempted to resuscitate Lacey, despite all evidence to the contrary. Ex. 55; Anderson 92-95.

- ███████████████████████████████████████████████
  ██████████████████████████████████████████

Blame, evade, and lie was the name of the game at the Jail, and that culture came from the top down. *See* Anderson 203-04 (Sheriff Gustafson was the common denominator for the cultural issues before and after Lacey's death). Jail administration was deliberately indifferent to the Jail's culture of deliberate indifference. *See, e.g.*, *Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *12 (6th Cir. May 13, 2024) (reversing summary judgment on *Monell* claim where municipality had a "culture of acceptance of impropriety, including by ignoring procedures in place to ensure constitutional compliance"). Jail leadership was subjectively aware of the practices persisting at its Jail regarding observation of inmates with special needs—with fatal consequences—and deliberately chose not to do anything. The "inevitable result" of the County's failure to address the custom was its "continuation," which resulted in Lacey's death. *Ware*, 150 F.3d at 885.

It is the County's burden to establish an absence of material fact disputes relating to Plaintiff's *Monell* claim. Notably, the County focuses on the initial booking and housing decision, while not acknowledging the rampant deliberate indifference that occurred *after* booking. Dkt. 78-2 at 38-39. Unable to defend its employees' shameful conduct throughout the evening, the County

falls back on the opinion of its correctional expert that Jail staff operated "substantially" in line with the North Dakota Correctional Facility Standards. Dkt. 78-2 at 39. It is hard to understand how Eiser could state with any certainty that the COs substantially complied with the standards when the regulatory body tasked with promulgating and enforcing those standards found the extent of the noncompliance so far-reaching that it had to shut down the Jail. Ex. 56. Even if Eiser were an expert on the North Dakota standards, the fact that his testimony directly conflicts with that of the DOCR investigator creates a disputed issue of material fact. Anderson 24 (no one knows more about North Dakota jails than him), 108-111 (detailing extensive noncompliance). The derisive attitude Azure and Brunelle display in a six-hour slice of their collective eight years of employment as Rolette County COs didn't happen overnight.

Through a culture of complacency, evasion, and dishonesty, Rolette County condoned the pervasive and documented custom at its Jail of disregarding life safety issues and failing to observe inmates. This custom was the moving force behind Lacey's death. Genuine factual disputes preclude summary judgment on Plaintiff's *Monell* claim.

### III. The COs' Callousness is Enough for Punitive Damages, and Then Some

The County Defendants make the bold assertion that there is "not one scintilla of evidence" to support punitive damages.[25]  Dkt. 78-2 at 40. Punitive damages are intended to punish defendants for "outrageous, intentional, or malicious conduct" and deter others from acting in a similar way. *Washington v. Denney*, 900 F.3d 549, 564 (8th Cir. 2018) (quoting *Schaub*, 638 F.3d at 922-23). They are appropriate when the factfinder determines that a defendant's conduct was

---

[25]    The County Defendants refer to Plaintiff's "claim" for punitive damages, but punitive damages are a type of relief, not a standalone claim. *See Elias v. Navasartian*, No. 15-CV-01567, 2017 WL 1013122, at *4 (E.D. Cal. Feb. 17, 2017) (collecting cases). Regardless, this "claim" is not subject to dismissal.

"motivated by evil motive or intent" or involved "reckless or callous indifference to the federally protected rights of others." *Id.* (quotation omitted).

There is more than enough evidence for a jury to award punitive damages based on the COs' callousness in this case. Start with what Azure and Brunelle were doing *instead* of watching Lacey: having sexual contact in the control room, Ex. 38-B; ████████████████ ████████████; scrolling their phones, Ex. 40-C; and ordering takeout, Exs. 32-G, ████. Moreover, the fact that multiple witnesses who watched the footage from Lacey's cell felt outraged by the COs' indifference suggests reasonable jurors could, too. *E.g.*, Boe 262 (the clothes change was "hard to watch," and he would not expect any human to walk away without checking on Lacey again); Zachmeier 30 ("[W]atching the video, I was offended."). Even defense expert Dr. Leingang, a police-officer-turned-doctor with an admitted "healthy respect" for law enforcement, couldn't help but be critical of the COs after watching the video. Leingang 40-43, 284 (he was "personally saddened" by what he saw in the footage and had to comment on the COs' failures).

But the Court need not look further than the COs' own words when determining whether there is sufficient evidence for a jury to award punitive damages. The reprehensible statements recorded in the control room evince a callous indifference that no reasonable jury could ignore:

- The COs joking that all Lacey had in her cell was her "blanket" and "her mom" because of her hallucinations;
- ████████████████████████████████████████████;
- Brunelle ████████████████████████████ when Lacey urinated on herself and needed a change of clothes and medical attention;
- Azure saying, "fucking knock it off" and "fuck, just wear your underwear" about Lacey being too unwell to get her pants on, Ex. 38-I;
- Azure commenting "15-minute watch, fuck that shit" after winking with the other COs that Lacey was not high on drugs;
- Brunelle telling Azure: "I don't think it's gonna matter whether the light's on or off

for that fucking dumb bitch" when the inmates asked them to turn on the lights;

- Azure—the same CO the County claims tried to make Lacey "comfortable"—saying ███████████████████████████████████████ ████████████████████.

Azure and Brunelle personified the Jail's culture of disregarding inmates' serious medical needs and thinking of inmates as less than human. The jury is entitled to have the option of awarding punitive damages in response to their cruel indifference to Lacey's serious medical needs.

## CONCLUSION

The County Defendants' Motion for Summary Judgment should be denied.

Dated:  January 27, 2025                    **ROBINS KAPLAN LLP**


By:    */s/  Andrew J. Noel*
        Andrew J. Noel (#322118)
        Marc E. Betinsky (#0388414)
        Julie C. Moroney (#0504300)
        800 LaSalle Avenue, Suite 2800
        Minneapolis, MN 55402
        Telephone:    612.349.8500
        ANoel@RobinsKaplan.com
        MBetinsky@RobinsKaplan.com
        jmoroney@RobinsKaplan.com

        Timothy Q. Purdon (#05392)
        1207 West Divide Avenue, Suite 200
        Bismarck, ND 58503
        tpurdon@robinskaplan.com
        Telephone:    701.255.3000
        *Attorneys For Plaintiff*