IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| Jessica Allen, individually and on behalf of the Heirs at Law of Lacey Higdem,<br><br>Plaintiff,<br><br>v.<br><br>Myles Brunelle, in his individual capacity; April Azure, in her individual capacity; Rolette County; Roy Cordy, MD; and Presentation Medical Center,<br><br>Defendants. | Civil No. 3:22-CV-00093-PDW-ARS<br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MYLES BRUNELLE, APRIL AZURE, AND ROLETTE COUNTY'S MOTION FOR SUMMARY JUDGMENT** |

\*\*\*    \*\*\*    \*\*\*

In her Response,[1] Plaintiff Jessica Allen ("Allen") relies heavily on newly produced video and audio evidence and statements of inmates to buttress her claims against County Defendants.[2] None of this evidence creates any genuine issue of material fact relevant to County Defendants' motion for summary judgment, as the evidence is inadmissible. Allen has also not cited any controlling authority to suggest County Defendants are not entitled to qualified immunity. For these reasons and as discussed in County Defendants' principal memorandum, County Defendants are entitled to summary judgment.

**I.    The Newly-Produced Audio Files Submitted in Support of Allen's Response are Inadmissible Hearsay**

---

[1] Plaintiff's Memorandum in Opposition to County Defendants' Motion for Summary Judgment (Doc. 109) is hereinafter referred to as Allen's "Response."

[2] Defendants Myles Brunelle ("CO Brunelle"), in his individual capacity, April Azure ("CO Azure"), in her individual capacity, and Rolette County are collectively referred to herein as "County Defendants."

In conjunction with her Response, Allen submitted numerous videos from the control and dispatch rooms at Rolette County Law Enforcement Center ("Jail"), each of which contains accompanying audio. Docs. 111-27 through 111-49. These videos were produced during discovery, however, County Defendants were not aware of any audio accompanying the videos until they were provided to the undersigned by counsel for Allen on December 31, 2024, apparently in a converted format. Affidavit of Grant T. Bakke, February 10, 2025 ("Bakke Aff."), at ¶ 4. In her Response, Allen explains:

> The Jail produced video from the control and dispatch rooms in December 2023. In December 2024, after the County Defendants filed their motion, Plaintiff's counsel's IT department converted these videos to an easier format for viewing because they were grainy and laggy. *See* Exs. 27-49. In doing so, Plaintiff discovered the video files have had corresponding audio the entire time, a fact previously unknown to Plaintiff, and presumably the other parties.

Doc. 109 at p. 9, n.10. In a declaration filed in conjunction with Allen's Response, counselor Andrew Noel provides, "In this declaration, where I have referenced that videos were 'converted' by Plaintiff's counsel's IT department, the videos were simply changed to a different playable format so that associated audio would be able to be heard. The videos were not altered in any way." Doc. 111 at ¶ 72. The IT provider for counsel for County Defendants has attempted to independently obtain the audio from the videos originally produced in discovery, but the IT provider has been unable to do so. Bakke Aff. at ¶ 5.

"At summary judgment, the requisite 'genuine dispute,' Fed. R. Civ. P. 56(a), must appear in *admissible* evidence." *Crews v. Monarch Fire Protection Dist.*, 771 F.3d 1085, 1092 (8th Cir. 2014). "Hearsay evidence is inadmissible and 'cannot be used to defeat a summary judgment motion' unless a federal statute or rule provides otherwise." *USI Insurance Services LLC v. Bentz*, No. 1:18-cv-00255, 2023 WL 5670683, at * 13 (D.N.D. Apr. 21, 2023) (quoting *Edmonds v. Minneapolis Pub. Schs. Special Sch. Dist. 1*, 368 F. Supp. 3d 1329, 1338 (D. Minn. 2018)). Rule 54 provides, "An

affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 54(c)(4).

Here, the videos of the control room and dispatch room with audio are inadmissible hearsay. Allen asserts "Plaintiff's counsel's IT department converted these videos," but the only declaration supporting what actions were taken was submitted by Mr. Noel, who is one of Allen's attorneys, not a part of the IT department. In his declaration, Mr. Noel describes what actions the IT department took, not what actions he took, to convert the videos. These statements were clearly offered for the truth of the matter asserted, i.e. what actions the IT department took in relation to the videos. Therefore, Mr. Noel's declaration is not based on personal knowledge, and is hearsay. *See* Fed. R. Evid. 801(c).

"When an objection is made to evidence relied on at summary judgment, the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Horn v. Airway Services, Inc.*, No. 18-CV-3053 CJW-MAR, 2020 WL 420834, at *2 (N.D. Iowa Jan. 27, 2020) (citations omitted). The Eighth Circuit has held that when the party relying on statements at summary judgment provides only secondhand testimony instead of an affidavit of the declarant, such statements are inadmissible. *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019). Allen has neither shown the videos with accompanying audio that she produced only after County Defendants moved for summary judgment are admissible as evidence nor explained whether any admissible form of that evidence may be offered in the future. The videos with accompanying audio (Docs. 111-27 through 111-49) are inadmissible hearsay based on secondhand testimony which should be excluded by the Court in its consideration of County Defendants' summary judgment motion.

## II. Allen has Failed to Marshal Admissible Evidence Showing Higdem had Any Obvious Medical Need Due to Her Intoxication

Allen asserts that Higdem's condition deteriorated while she was at the Jail, and that she "exhibited symptoms of severe intoxication that were obvious to a layperson, evidenced by multiple people—the other inmates in [Higdem's] housing unit—telling the COs that she should be taken back to the hospital." Doc. 109 at p. 20. In support of that assertion, Allen cites to a "Statement of Brianna Mayer" dated August 23, 2024, which Allen untimely served upon the defendants that same day, over two months after the deadline for discovery in this case. Docs. 40, 111-61; **Ex. MM**.[3] Where a party fails to disclose in a timely manner, "Rule 37(c)(1) makes exclusion of evidence the default, self-executing sanction for the failure to comply with Rule 26(a)." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 705 (8th Cir. 2018). The Eighth Circuit has repeatedly held that untimely disclosed affidavits are properly excluded on summary judgment due to the prejudice caused to other parties by the inability to depose the affiant prior to the close of discovery. *Goosen v. Minn. Dep't of Transportation*, 105 F.4th 1034, 1039 (8th Cir. 2024); *Malone v. Ameren UE*, 646 F.3d 512, 516 (8th Cir. 2011). As County Defendants had no opportunity to depose Mayer when her affidavit was untimely disclosed, it should be excluded from the Court's consideration on summary judgment.

Allen also asserts the obviousness of Higdem's intoxication is shown by the interview testimony of Stephanie Myers, another inmate who was at the Jail at the same time as Higdem, through her telephone interview with BCI Agent Craig Zachmeier as part of his criminal investigation into Higdem's death. Docs. 109 at p. 20, 111-62. Investigative reports are inadmissible unless each level of hearsay falls within an exception to the hearsay rule. *U.S. v. Taylor*, 462 F.3d 1023, 1026 (8th

---

[3] A true and correct copy of each exhibit referenced herein is attached to the Affidavit of Grant T. Bakke, February 10, 2025, filed herewith.

Cir. 2006); *see also Walker v. Wayne Cty., Iowa*, 850 F.2d 433, 435 (8th Cir. 1988) (Iowa Division of Criminal Investigation Report containing unsworn witness interviews constituted double hearsay).[4]

In this case, Allen never deposed Myers or disclosed any sworn testimony of Myers. Her unsworn telephone interview with Agent Zachmeier constitutes inadmissible hearsay, and Allen has not offered any reason that her interview testimony may be admissible. As such, Myers' testimony should be excluded on summary judgment.

Finally, Allen argues CO Azure admits Higdem had an objectively serious medical need through her deposition testimony that Higdem's behavior during the clothes change was common in the Jail and not necessarily concerning, while also testifying that if she saw someone at a public library act like Higdem she would probably call the police. Docs. 109 at p. 21. But Allen fails to include CO Azure's entire testimony in response to being asked if seeing someone acting like Higdem at a library would concern her anymore than someone at the jail, to which she responded, "Yeah, I – I don't know how I would react any differently" and explained "I didn't feel like [Higdem] was in any health danger at the time." Doc. 92 at pp. 245-247. In other words, CO Azure's tends to refute, not admit, that Higdem had an objectively serious medical need. Allen has not provided any admissible evidence to support her claim that Higdem had any obvious medical need due to her intoxication.

---

[4] *See also Riggs v. Gibbs*, No. 14-0676-CV-W-FJG, 2020 WL 13158009, at *1 (W.D. Mo. Apr. 7, 2020) ("[E]ven if police reports are public records, hearsay statements from third parties therein should be excluded"). The Eighth Circuit has unambiguously held that unsworn statements may not be considered on summary judgment:

> When a qualified-immunity question arises on a motion for summary judgment, we must accept as true the facts asserted by the plaintiff to the extent they are properly supported in the record. . . . [Plaintiff's] unsworn telephone-hearing statements were not properly submitted under Federal Rule of Civil Procedure 56(c), however, and thus the district court erred, as a matter of law, in relying on those statements in denying the motion for summary judgment.

*Risdal v. Nixon*, 589 Fed. Appx. 801, 803 (8th Cir. 2014) (per curiam) (citations omitted).

### III. Allen has Submitted No Admissible Evidence that CO Azure or CO Brunelle had Knowledge of Any Serious Medical Need of Higdem

Allen asserts CO Brunelle and CO Azure both knew Higdem was suffering from an objectively serious medical need after CO Azure assisted Higdem with the change of her soiled clothes. Doc. 109 at pp. 22-23. Allen argues this is demonstrated in part by Higdem's hitting her head on the wall during the clothes change, by CO Azure asking CO Brunelle if they should take Higdem back to the hospital, and by the statements of other inmates. *Id.* at pp. 22-23. However, CO Azure denied thinking there was anything seriously wrong with Higdem when she changed her clothes and testified that Higdem was coherent during their brief conversation. Doc. 92 at pp. 30-31, 98. And Higdem clearly did not forcefully hit her head against the wall, as her autopsy report did not note any injuries to her head. Doc. 87-7 at p. 3. The statements of Brianna Mayer, Joanna LaVallie, and Stephanie Myers cited by Allen in support of her argument are inadmissible for the same reasons discussed in Section II, supra.

Consideration of the totality of the circumstances elucidates the reason CO Brunelle and CO Azure did not have subjective knowledge of any serious medical need Higdem had until CO Brunelle discovered she was not breathing. Even if CO Brunelle and CO Azure learned Higdem was intoxicated on methamphetamine the moment they arrived at the Jail to begin the night shift, the information they received, according to Allen, was that Higdem had been hallucinating and acting "crazy high" from the moment she had arrived at the Jail earlier that day. Doc. 109 at p. 9. Allen has not presented any admissible evidence refuting CO Brunelle and CO Azure's deposition testimony that they were advised Higdem had been medically cleared for jail by a physician while exhibiting substantially the same behavior. By discharging Higdem from PMC while she was clearly hallucinating and intoxicated on methamphetamine, and by failing to advise jail staff of any danger related to Higdem's methamphetamine intoxication, or even that Higdem was intoxicated on

methamphetamine, the only reasonable conclusion Dr. Cordy left for jail staff to draw was that Higdem's behaviors consistent with those conditions did *not* present a medical concern.

Allen's own emergency physician expert Dr. Benton Hunter explained how Dr. Cordy's failures to meet the standard of care in providing medical care to Higdem created this situation. In his expert report, Dr. Hunter provided:

> Discharging Ms. Higdem, whether it had been to herself or to law enforcement, was the most egregious breach of the standard of care, but not providing any instructions or warning signs to watch for in the setting of methamphetamine intoxication was a further breach, including by failing to alert the jail staff to her actual problem, condition, and risk for deterioration, and by failing to provide any instructions for how to monitor her condition or when she should be returned to the hospital.

**Ex. NN** at p. 5. In his rebuttal report, Dr. Hunter further provided:

> An officer knowing that a patient has used meth is very different than making sure that officer, or the other officers that will be around her, knows what to watch for in terms of dangerous symptoms or indications that she could be deteriorating or at risk of decompensating. Additionally, Mr. Slater was not going to be expected to be with Lacey throughout her jail stay, so some form of written instructions was imperative so that the subsequent officers or jail staff in charge of Lacey could have that information.

**Ex. OO** at p. 4. Further, Dr. Hunter opined that "Lacey Higdem was displaying classic signs of methamphetamine overdose before, during, and after her time in the ED."[5] **Ex. PP** at p. 5. But if Higdem was in fact overdosing—or at least dangerously intoxicated—on methamphetamine while she was evaluated by Dr. Cordy, but Dr. Cordy did not recognize it, how could the jail staff be expected to do so? Further, the supposed deterioration of Higdem's condition has only been discussed by individuals who, with the benefit of hindsight, reviewed booking and cell videos of Higdem with a fine-toothed comb, focusing their attention exclusively on Higdem's conduct. That is entirely

---

[5] At his deposition, Dr. Hunter indicated that the word "overdose" in this sentence should be changed to "intoxication," and that he considers both overdose and intoxication to be on the same spectrum. Ex. PP at pp. 100, 101, 169.

different than the actual circumstances which CO Brunelle and CO Azure encountered, as there were 20 other inmates present at the Jail during Higdem's detention who also required observation, medications, and other attention. *See* Doc. 77-16 at p. 2; *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998).

### IV.    Allen Lacks Admissible Evidence to Show Deliberate Indifference

To support her claim that CO Azure and CO Brunelle were deliberately indifferent to Higdem's serious medical needs, Allen again points to the newly produced video/audio files, which are fatally inadmissible as described in Section I, supra. Doc. 190 at p. 25. Allen also cites County Defendants' emergency medicine expert Dr. Leingang's opinions critical of jail staff. Doc. 109 at pp. 24-25. However, Dr. Leingang testified he does not have any expert opinions regarding the actions or inactions of jail staff. Doc. 77-20 at pp. 258-259.

Allen suggests Higdem's "screaming and banging on her cell door—later moaning and groaning" demonstrates deliberate indifference akin to the circumstances in *Ryan v. Armstrong*, 850 F.3d 419 (8th Cir. 2017). However, the detainee in *Ryan* made loud howling and screaming vocals for eight hours throughout the night and banged his head against the door of his cell for eight straight hours, resulting in a large pool of blood on the floor that had come from a laceration to the detainee's head. *Id.* at 423-26. Despite Allen's insinuations otherwise, Higdem did not scream and howl for hours on end and did not bang her head (or any other body part) against the walls resulting in any notable blood loss or injury.

Allen finally asserts "Brunelle's abject failure to start CPR and attempt to perform any lifesaving efforts on [Higdem] amounts to deliberate indifference in and of itself[,]" citing *McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009). However, the officer in *McRaven* was denied qualified immunity because, when he encountered the incapacitated detainee, he stood over him and shook him

for seven minutes until paramedics arrived rather than performing CPR. *Id.* at 983. Here, while CO Brunelle did not perform CPR on Higdem, he immediately sought assistance from the other correctional officers when he realized Higdem had a serious medical need.

### V.     CO Brunelle and CO Azure are Entitled to Qualified Immunity

The Eighth Circuit Court of Appeals has held that when a trained medical provider negligently examines a detainee and determines there is no serious medical concern, the officers are entitled to qualified immunity even if: (1) the detainee's medical condition deteriorates; (2) the officers recognize the deterioration; and (3) and the officers take no further action to obtain medical assistance. In *Krout v. Goemmer*, the Eighth Circuit determined:

> When Riley arrived at the detention center, he stated to Sawdy, Hill, and Ketcherside that his back and legs were broken, and that he could not feel his legs. . . . While Rylee was in the isolation cell, Ketcherside saw (and Sawdy was informed) that he remained on his stomach in the same position in which he had been placed initially, moving only his arms. Given these facts, Sawdy, Hill, and Ketcherside recognized substantial risks to Riley's health.
>
> The record does not establish, however, that they were deliberately indifferent to those risks. Although all three officers were aware that Sawdy had not meaningfully assessed Rylee, they knew that Rylee was under close observation, with officers checking him every fifteen minutes as Sawdy had ordered. . . .
>
> . . . Rylee's breathing appears to have worsened around 5:30 a.m., when he asked for help to lift up his head because he was unable to do so on his own. Around that time, Floyd repositioned Rylee's neck three times, and Sawdy and Ketcherside shifted his body in the wheelchair. These actions appeared to ease his breathing. Nonetheless, Rylee remained slumped over and with his head down for most of the later morning hours. . . .
>
> . . . That a trained medical technician did not appreciate the risks attendant to Rylee's condition undermines an inference that the untrained officers obviously knew that Rylee was at serious risk to stop breathing or that his neck was broken. Given what they did know, it cannot be said that the officers deliberately ignored Rylee's plight. Sawdy, Ketcherside, and Floyd assisted him in adjusting his position, and they located Rylee in the booking area for immediate observation. The record in the light most favorable to Krout at most shows negligence by Sawdy, Hill, and Ketcherside in failing to summon medical personnel for another visit when Rylee's condition

appeared to deteriorate. The evidence is insufficient to demonstrate deliberate indifference, and the officers are entitled to qualified immunity.

583 F.3d 557, 568-70 (8th Cir. 2009). Surely CO Brunelle and CO Azure's actions were not beyond constitutional debate when this circuit's precedent establishes medical help need not be summoned for a man struggling to breath with a broken neck.

In asserting County Defendants are not entitled to qualified immunity, Allen's reliance on *Thompson v. King*, 730 F.3d 742 (8th Cir. 2013) and *Barton v. Taber*, 908 F.3d 1119 (8th Cir. 2018) is misplaced.[6]

## VI. Conclusion

For the foregoing reasons, County Defendants request all of Allen's claims against them be dismissed with prejudice.

---

[6] In *Thompson*, the arresting officer took a detainee, who was found with an empty Xanax bottle filled two days prior and admitted to having ingested some of the pills, straight to jail. 730 F.3d at 745. The arrestee fell asleep in the patrol vehicle during transport to jail, and again at booking. *Id.* After he was placed in his cell, a fellow inmate informed a jailer he needed help because his body had just slid down the window of his jail cell, but the jailer ignored him, and his body was found non-responsive two hours later. *Id.* Here, unlike in *Thompson*, Higdem was taken to a hospital for medical clearance upon her arrest prior to being booked into jail. Higdem also did not fall asleep during transport or booking, but rather was hallucinating on methamphetamine. Most importantly, when other inmates brought concerns about Higdem to CO Brunelle and CO Azure, the correctional officers did not do nothing like in Thompson, but were able to easily verify that Higdem was breathing and moving, as she was exhibiting symptoms of methamphetamine intoxication. Stated differently, in *Thompson*, the warning from the fellow inmate was that the detainee had slid down the window of his cell and was not giving signs of life—while here, the inmates warnings about Higdem were that she was too lively. *Barton v. Taber*, 908 F.3d 1119 (8th Cir. 2018) is materially distinguishable from the present case as well, most importantly by the fact that the arrestee in *Barton* did not receive a medical evaluation before being booked into jail despite the booking officer's knowledge that the arrestee had just been in a car accident, and was showing signs of severe intoxication during booking. *Barton*, 908 F.3d at 1125. The Eighth Circuit reasoned that a healthcare screening, required by the jail's policies, would have revealed significant bruising on the arrestee's back and legs. *Id.* The booking officer also testified that the arrestee was in the worst shape of anyone she had ever booked. *Id.* at 1124. This is in stark contrast to the present case, where Higdem was appropriately taken to PMC for medical clearance before being booked into Jail, and where several correctional officers testified there were people booked into the Jail in worse shape than Higdem every week.

Dated this 10th day of February, 2025.

          BAKKE GRINOLDS WIEDERHOLT

          By: */s/ Grant T. Bakke*
              Randall J. Bakke (#03989)
              Shawn A. Grinolds (#05407)
              Grant T. Bakke (#09106)
              300 West Century Avenue
              P.O. Box 4247
              Bismarck, ND 58502-4247
              (701) 751-8188
              rbakke@bgwattorneys.com
              sgrinolds@bgwattorneys.com
              gbakke@bgwattorneys.com

          Attorneys for Defendants Myles Brunelle, in his individual capacity; April Azure, in her individual capacity; and Rolette County.

## CERTIFICATE OF SERVICE

    I hereby certify that on February 10, 2025, a true and correct copy of the foregoing **REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MYLES BRUNELLE, APRIL AZURE, AND ROLETTE COUNTY'S MOTION FOR SUMMARY JUDGMENT** was emailed to the following:

Andrew J. Noel
Marc E. Betinsky
Julie Moroney
Robins Kaplan LLP
800 LaSalle Avenue
Ste 2800
Minneapolis, MN 55402
anoel@robinskaplan.com
mbetinsky@robinskaplan.com
jmoroney@robinskaplan.com

Timothy Q. Purdon
Robins Kaplan LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58503
tpurdon@robinskaplan.com

- 12 -

Megan J. Flom
Randall S. Hanson
Camrud, Maddock, Olson & Larson, LTD
PO Box 5849
Grand Forks, ND 58206-5849
mflom@camrudlaw.com
rhanson@camrudlaw.com

                                                   By: */s/ Grant T. Bakke*
                                                        GRANT T. BAKKE